UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

2014 FEB 27  P 11: 46

U S DISTRICT COURT SDNY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KATHERINE ELIZABETH BARNET AND WILLIAM
JOHN FLETCHER, AS LIQUIDATORS OF OCTAVIAR
ADMINISTRATION PTY LTD (IN LIQUIDATION),

               Plaintiffs,

      v.

DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP,
FORTRESS INVESTMENT GROUP LLC, GLENN
PATRICK CUMMINS, CONSTANTINE MICHAEL
DAKOLIAS, AND MARC KEITH FURSTEIN,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**14 CV 1376**

Case No. _____

RECEIVED
FEB 27 2014
U.S....
CASHIERS

## COMPLAINT

Madlyn Gleich Primoff, Esq.
Angela R. Vicari, Esq.
Joseph Otchin, Esq.
425 Park Avenue
New York, N.Y. 10022
(212) 836-8000
mprimoff@kayescholer.com

*Attorneys for Katherine Elizabeth Barnet
and William John Fletcher, as
liquidators of Octaviar Administration
Pty Ltd (in liquidation)*

61844353.docx

# TABLE OF CONTENTS

Page

NATURE OF ACTION ................................................................................................... 1

PARTIES ......................................................................................................................... 6

    The Liquidators ....................................................................................................... 6

    The Defendants ....................................................................................................... 7

        A.    Drawbridge Special Opportunities Fund LP ............................................ 7

        B.    Fortress Investment Group LLC .............................................................. 8

        C.    The Director Defendants.......................................................................... 8

JURISDICTION AND VENUE ..................................................................................... 10

STATEMENT OF FACTS ............................................................................................. 11

    The Octaviar Group .............................................................................................. 11

    The Defendants Dominated and Controlled Fortress and FIGA ......................... 13

    Fortress Entered Into the Octaviar Group's Castle Facility ............................... 17

    Only OA Had Intercompany Loans to the Stella Group and, Therefore, OA Was
    Entitled to Receive All of the Stella Sale Proceeds ........................................... 19

        A.    The Refinancing of the Stella Group's External Debt "Locked In"
                OA as the Only Entity in the Octaviar Group with Intercompany
                Loans to the Stella Group ....................................................................... 20

        B.    OA's Loans to the Stella Group.............................................................. 21

    August Through November 2007: Fortress Used the First and Second
    Amendments to the Castle Facility to Improve Its Position .............................. 24

    The Sale of the Stella Group Diverted Funds from OA for the Benefit of Fortress
    and Ultimately the Drawbridge Funds; Collapse of the Octaviar Group........................ 26

    The Castle Facility Was Amended So That Fortress Could Arrogate to Itself and
    Ultimately the Drawbridge Funds Stella Sale Proceeds to  Which OA Was
    Rightfully Entitled .............................................................................................. 29

The Defendants Improperly Caused OA to Release Its Intercompany Loans to the Stella Group Without Any Assurance that OA Would Receive Any Consideration, Let Alone Fair Consideration ..................................................... 32

The Defendants Dominated and Controlled the Activities of Fortress, FIGA, Kelleher and Kwei, Who in Turn Improperly Exercised Domination and Control over OL, OA and Anderson and White to Effect the Payment of Stella Sale Proceeds to Fortress ................................................................................ 36

Additional Fraudulent Transfers Were Made to Fortress in December 2008 and February 2009 ............................................................................................ 39

Anderson and White Breached Their Fiduciary and Other Duties as Directors of OA .................................................................................................................. 40

The Defendants Restructured Fortress and the Other Australian Fortress Entities to Thwart the Efforts of the Liquidators and OA's Creditors to Recover on Their Claims Against Fortress ................................................................................ 49

The OA Liquidation Proceeding ........................................................................ 52

The Australian Fortress Lawsuit ....................................................................... 54

The Liquidators Commenced Proceedings in the U.S. to Investigate Defendants' Wrongful Conduct and Bring Claims As Appropriate .................................... 55

    A.    The Chapter 15 Case .................................................................... 55

    B.    The Section 1782 Proceeding ....................................................... 56

FIRST CAUSE OF ACTION (Knowing Receipt of Property in Breach of Trust under Australian Law) ................................................................................................. 57

SECOND CAUSE OF ACTION (Fraudulent Transfers Under New York Debtor and Creditor Law §§ 270 through 279) ....................................................................... 58

THIRD CAUSE OF ACTION (Aiding and Abetting Fraudulent Transfers Under New York Law) ............................................................................................................. 61

FOURTH CAUSE OF ACTION (Subsequent Transactions to Defeat Claims of Liquidators Under Australian Law) ..................................................................... 63

FIFTH CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty Under New York Law) ..................................................................................................... 65

SIXTH CAUSE OF ACTION (Involvement in Contraventions of OA Directors' Duties Under the Australian Corporations Act) ................................................................. 67

SEVENTH CAUSE OF ACTION (Knowing Assistance in Breach of Fiduciary Duty Under Australian Law) .......................................................................................... 69

EIGHTH CAUSE OF ACTION (Unjust Enrichment Under New York Law) ........................... 70

NINTH CAUSE OF ACTION (Conspiracy Under Australian Law) .......................................... 71

TENTH CAUSE OF ACTION (Shadow Director or Officer Claim Under Australian Law) ........................................................................................................................... 73

ELEVENTH CAUSE OF ACTION (Conversion Under New York Law) ................................. 76

TWELFTH CAUSE OF ACTION (Aiding and Abetting Fortress's Conversion Under New York Law) ......................................................................................................... 77

THIRTEENTH CAUSE OF ACTION (Aiding and Abetting Drawbridge U.S.'s Conversion Under New York Law) .......................................................................... 78

FOURTEENTH CAUSE OF ACTION (Tortious Interference with Contractual Relations Under New York Law) .......................................................................... 78

Plaintiffs Katherine Elizabeth Barnet and William John Fletcher (the **"Liquidators"**), as the liquidators of Octaviar Administration Pty Ltd (in liquidation) (**"OA"**), by their undersigned attorneys, as and for their Complaint, allege as follows based on knowledge as to themselves and upon information and belief as to all other matters:

## NATURE OF ACTION

1.      As the duly appointed liquidators of OA in a liquidation proceeding (the **"OA Liquidation Proceeding"**) presently pending before the Supreme Court of Queensland, Australia (the **"Australian Court"**), the Liquidators are charged with fiduciary duties under Australian law to investigate potential claims and causes of action; commence suit in order to recover on such claims and causes of action for the benefit of OA's creditors, to the extent appropriate; and distribute the assets of OA (including any litigation recoveries) to OA's creditors in accordance with Australian law.

2.      The Liquidators' investigation into the collapse of OA spans two continents and has been ongoing for over four years.  It has led them from Australia to this Court, where they seek to recover hundreds of millions of dollars in damages caused by the Defendants' misconduct, including approximately $200 million[1] in funds that the Defendants wrongfully diverted from OA to the pockets of Drawbridge Special Opportunities Fund LP (**"Drawbridge U.S."**) and Drawbridge Special Opportunities Fund Ltd (**"Drawbridge Cayman"** and, together with Drawbridge U.S., the **"Drawbridge Funds"**) plus damages for the harm they caused to OA and its creditors.

3.      Prior to OA's insolvency, each of the Defendants directed and controlled the financing arrangements between their Australian affiliate, known as Fortress Credit Corporation

---

[1]      All dollar amounts are Australian dollars unless otherwise indicated.

(Australia) II Pty Limited ("**Fortress**"), and certain companies within a larger group of companies known as the "**Octaviar Group**". Although these financing arrangements were entered into by Fortress and certain members of the Octaviar Group (but, notably, not OA), the proverbial "buck" started and stopped with the Defendants in New York. Indeed, the Drawbridge Funds provided Fortress with funds used to make loans to members of the Octaviar Group in Australia; Fortress returned funds that it received as repayment of such loans to the Drawbridge Funds in New York; and the Defendants made all major decisions in New York relating to Fortress's financing arrangements in Australia with members of the Octaviar Group.

4.      The specific misconduct of the Defendants that the Liquidators seek to remedy concerns the Defendants' scheme to be repaid $250 million for loans that Fortress made to a company within the Octaviar Group, known as Octaviar Castle Pty Ltd ("**Castle**"), under a bridging finance facility dated June 1, 2007 (the "**Castle Facility**"). The ultimate holding company of the Octaviar Group, Octaviar Limited (receivers and managers appointed) (in liquidation) ("**OL**"), and another Octaviar Group entity known as MFS Financial Services Pty Limited ("**MFSL**"), guaranteed the obligations of Castle under the Castle Facility. OL executed a fixed and floating lien over its assets in favor of Fortress as security for its obligations as a guarantor under the Castle Facility. Critically, OA was not a party to or guarantor of the Castle Facility and had no obligations or debts owing to Fortress.

5.      After entering into the Castle Facility, Fortress and its manager, Fortress Investment Group (Australia) Pty Limited ("**FIGA**"), regularly received detailed information about the Octaviar Group's financial condition. In addition to written reports furnished by the Octaviar Group to Fortress, David Kelleher ("**Kelleher**") (a director of Fortress and FIGA) and Mark Kwei ("**Kwei**") (an officer of Fortress and an employee of FIGA), both of whom worked at the offices of Fortress and FIGA in Australia, communicated frequently with David Mark

Anderson ("**Anderson**") and Craig Robert White ("**White**"), who were directors of OA as well as officers and/or directors of Castle, OL and various other companies within the Octaviar Group. Kelleher and Kwei regularly and customarily conveyed what they learned from Anderson and White and other persons employed by one or more members of the Octaviar Group to the Defendants in New York during weekly Wednesday morning telephone conferences and through other communications.

6.     Through these communications, the Defendants had intimate knowledge of the Octaviar Group's financial position, including its ability to repay its obligations to Fortress under the Castle Facility. Shortly after the parties entered into the Castle Facility, the Defendants became aware that Fortress's ability to be repaid on the Castle Facility was in jeopardy. The Defendants proceeded to devise and implement a scheme to divert funds from OA for the benefit of Fortress and ultimately the Drawbridge Funds, at a time when OA was insolvent or would be rendered insolvent as a result of such transfers.

7.     Although this Complaint describes a complicated series of agreements, transactions and transfers, the crux of the Defendants' scheme for Fortress and ultimately the Drawbridge Funds to be repaid the loans extended under the Castle Facility is simple. In February 2008, the Octaviar Group sold a group of companies within the Octaviar Group known as the "**Stella Group**". All of the proceeds (the "**Stella Sale Proceeds**") of that sale should have been remitted to OA, which had substantial (*i.e.*, between $737 million and $1.34 billion) intercompany loans to the Stella Group outstanding at the time of the closing. No other entity within the Octaviar Group had any (or any substantial) intercompany loans outstanding to the Stella Group or any entitlement to the Stella Sale Proceeds.

8.     Nevertheless, the Defendants made sure that OA never received the funds to which it was entitled from the Stella Sale Proceeds by exercising their control over Fortress and

FIGA to ensure that Fortress and FIGA caused the Octaviar Group, Anderson and White to direct that the funds that rightfully belonged to OA — *i.e.*, the Stella Sale Proceeds — be siphoned off directly to Fortress, which was not even a creditor of either OA or the Stella Group. OA released between $737 million and $1.34 billion in intercompany loans to the Stella Group and ultimately received only $150 million in Stella Sale Proceeds. Thus, OA received approximately 10 to 20 cents on the dollar in respect of its loans to the Stella Group, while Fortress received **full** repayment of the Castle Facility out of the Stella Sale Proceeds — notwithstanding the fact that Fortress was not a creditor of the Stella Group or OA, had no interest in the Stella Group or OA and had no right to any portion of the Stella Sale Proceeds.

9.     The Defendants then caused Fortress to fraudulently transfer to the Drawbridge Funds in New York all or a substantial portion of the Stella Sale Proceeds that had been improperly siphoned off from the Stella Group sale to Fortress — either by causing Fortress to transfer such funds directly to the Drawbridge Funds or by causing Fortress to transfer the funds indirectly through certain Australian Fortress Entities[2] or other affiliates of the Drawbridge Funds. In addition, the Defendants caused Fortress to dissipate its assets through a series of transactions (collectively, the **"Subsequent Fortress Transfers"**) with affiliates in order to render Fortress judgment proof and thwart the efforts of the Liquidators and OA's creditors to recover on their claims against Fortress.

10.     The Defendants dominated and controlled both Fortress and FIGA. Further, the Director Defendants controlled, directed and supervised Kelleher and Kwei, the Fortress and FIGA personnel responsible for transactions with the Octaviar Group. As a result of the

---

[2]     Fortress, FIGA, Fortress Credit Corp (Australia) Pty Ltd (**"FCCA"**), FCCD (Australia) Pty Ltd (**"FCCD"**), FCCO (Australia) Pty Ltd (**"FCCO"**), FCCD (Australia) Nominee Pty Ltd (**"Nominee"**) and FCCO Australia II Pty Ltd (**"FCCO II"**) are collectively referred to herein as the **"Australian Fortress Entities"**.

Defendants' domination and control over Fortress, FIGA, Kelleher and Kwei, the Defendants exercised undue influence and control over the Octaviar Group (including Anderson and White). The Defendants' wrongful conduct resulted in Fortress grabbing the Stella Sale Proceeds before they could be remitted to OA at a time when OA was insolvent (or was rendered insolvent as a result of the Defendants' actions) and was unable to satisfy its obligations to creditors. Consequently, OA was placed into voluntary administration and, subsequently, liquidation by the Australian Court.  To date, OA's creditors have filed more than $2.1 billion in claims in the OA Liquidation Proceeding.

11.    Following their appointment by the Australian Court in September 2009, the Liquidators commenced an investigation into the facts and circumstances that led to OA's demise.  This investigation culminated in the Liquidators determining, in the exercise of their fiduciary and statutory duties under Australian law, to bring an action in the Australian Court against Anderson and White and the Australian Fortress Entities for the wrongful acts committed by them in Australia, which action was commenced on April 3, 2012 (the "**Australian Fortress Lawsuit**").    Likewise, the present action arises out of the same underlying facts and circumstances as the Australian Fortress Lawsuit, and seeks to hold the Defendants — who orchestrated the scheme to divert the Stella Sale Proceeds from OA, which was rightfully entitled to such funds on account of its substantial intercompany claims against the Stella Group — liable for the fraudulent transfers of Stella Sale Proceeds and the harm that they caused to OA and its creditors.

## PARTIES

### The Liquidators

12.     OA (formerly known as MFS Administration Pty Ltd) is a company existing under the laws of Queensland, Australia.  OA maintained its principal place of business at 5 Hicks Street, Southport, Queensland, Australia, prior to its closure by the Liquidators.

13.     On October 3, 2008, the directors of OA resolved to place OA into voluntary administration and to appoint John Lethbridge Greig and Nicholas Harwood as voluntary administrators.  On January 12, 2009, Messrs. Greig and Harwood were appointed as deed administrators pursuant to a Deed of Company Arrangement (the "**OA Deed**").  On July 31, 2009, the OA Deed was terminated.  Pursuant to section 446B of the Australian Corporations Act 2001 (Cth) (the "**Corporations Act**") and regulation 5.3A.07 of the Australian Corporations Regulations 2001, OA was deemed to have passed a special resolution that OA be voluntarily wound up.  The Australian Court appointed Messrs. Greig and Harwood as the liquidators of OA.

14.     On September 9, 2009, the Australian Court removed Messrs. Greig and Harwood and appointed the Liquidators as the liquidators of OA.  See Ex. A hereto (order appointing liquidators in the OA Liquidation Proceeding).

15.     Australian law provides that included among a liquidator's powers are the obligation to (i) wind-up the affairs of the company; (ii) distribute equitably the company's assets among its creditors; and (iii) examine the circumstances that precipitated the liquidation, which may reveal improper dispositions of property and criminal offenses.

16.     In order to fulfill his or her duties to creditors, a liquidator will often undertake investigations to (a) locate and recover assets; (b) explain to interested parties the circumstances leading to the company's liquidation; (c) identify transactions or offenses as a basis for the

recovery of assets for creditors; and (d) assist in the examination and/or prosecution of persons connected with the company.

17.     While the powers conferred on the Liquidators are broad under Australian law, the actions undertaken by the Liquidators and the manner in which they perform their rights, powers and duties are subject to the scrutiny of the Australian Court, creditors and government regulators.

18.     The powers of the Liquidators are also circumscribed by the common law in Australia.  Under well-accepted principles of Australian law, the Liquidators occupy a fiduciary position in relation to OA — the company to which they were appointed.  Thus, the Liquidators have fiduciary obligations, among other things:

(a)     to act honestly and to exercise their powers bona fide for the purpose for which they are conferred and not for any private or collateral purpose;

(b)     to not allow their private interests to come into conflict with their duties to OA;

(c)     to not make contracts with OA;

(d)     to not profit, either directly or indirectly, from their office other than to the extent of their authorized remuneration; and

(e)     to act at all times with complete impartiality as between the various persons interested in the property and liabilities of OA.

**The Defendants**

**A.     Drawbridge Special Opportunities Fund LP**

19.     Drawbridge U.S. is a limited partnership existing under the laws of Delaware with its principal place of business at 1345 Avenue of the Americas, New York, New York 10105. All of the partners of Drawbridge U.S. are citizens of states within the U.S.

20.     Drawbridge U.S. is a sophisticated entity that conducts business as a hedge fund, making diversified investments globally, including in loans and corporate securities. See Ex. B hereto, Second Further Amended Second Statement of Claim filed in the Australian Fortress Lawsuit on May 13, 2013 (the **"Statement of Claim"**), at ¶ 121D.

21.     Drawbridge U.S. is one of the ultimate parent companies of Fortress. Drawbridge U.S. approved any and all transactions entered into by Fortress and/or FIGA regarding the Octaviar Group and the Castle Facility.

**B.     Fortress Investment Group LLC**

22.     Defendant Fortress Investment Group LLC (**"FIG LLC"**) is a limited liability company existing under the laws of Delaware with its principal place of business at 1345 Avenue of the Americas, New York, New York 10105. All of FIG LLC's members are citizens of New York and Delaware.

23.     FIG LLC is a sophisticated asset-based investment management firm that raises, invests and manages private equity funds and hedge funds, including the Drawbridge Funds (*i.e.*, Drawbridge U.S. and Drawbridge Cayman). FIG LLC is the ultimate parent company of FIGA. FIGA has, at all material times, managed on behalf of Fortress its business and investments in Australia and provided services to Fortress, including employee services. FIG LLC approved any and all transactions entered into by Fortress and/or FIGA regarding the Octaviar Group and the Castle Facility.

**C.     The Director Defendants**

24.     Glenn Patrick Cummins is a citizen of the State of New York, with an address at 403 Hempstead Avenue, Rockville Centre, New York 11570, and a business address at 1345 Avenue of the Americas, New York, New York 10105. At all relevant times, Mr. Cummins was, *inter alia*, a director of Fortress.

25.     Constantine Michael Dakolias is a citizen of the State of New York, with an address at 7 Hemlock Road, Bronxville, New York 10708, and a business address at 1345 Avenue of the Americas, New York, New York 10105.  At all relevant times, Mr. Dakolias was, *inter alia*, a director of Fortress.

26.     Marc Keith Furstein is a citizen of the State of New York, with an address at 1930 Broadway Apt. 28G, New York, New York 10023, and a business address at 1345 Avenue of the Americas, New York, New York 10105.  At all relevant times, Mr. Furstein was, *inter alia*, a director of Fortress.

27.     Messrs. Cummins, Dakolias and Furstein (collectively, the "**Director Defendants**") wore many hats.  In their capacity as directors of Fortress, FIGA and the other Australian Fortress Entities,[3] the Director Defendants (together with their fellow directors, James Kendrick Noble III and Kelleher) were responsible for all major decisions by the Australian Fortress Entities, including all major decisions concerning Fortress and/or FIGA's dealings with the Octaviar Group.

28.     The Director Defendants controlled, directed and supervised Fortress and FIGA, and authorized and approved the scheme to divert funds from OA to Fortress, as discussed more fully above and below.

29.     In addition to serving as directors of the Australian Fortress Entities, the Director Defendants also hold various positions at FIG LLC and Drawbridge U.S.  More particularly:

- Mr. Cummins holds the titles of (a) chief financial officer at Drawbridge U.S. and (b) associate portfolio manager at FIG LLC.

---

[3]     Of the Director Defendants, only Mr. Dakolias was a director of FCCO II.  See Ex. B (Statement of Claim), at ¶¶ 4, 6, 117-121.

- Mr. Dakolias holds the titles of (a) chief credit officer at Drawbridge U.S. and (b) managing director at FIG LLC.

- Mr. Furstein holds the titles of (a) chief operating officer at Drawbridge U.S.'s general partner, Drawbridge Special Opportunities GP LLC; and (b) managing director at FIG LLC.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  Diversity exists because (a) the Liquidators are citizens of Australia and the Defendants are all citizens of states within the U.S. and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

31.    This Court has personal jurisdiction over Drawbridge U.S. pursuant to New York Civil Practice Law and Rules ("**CPLR**") § 301 because Drawbridge U.S. does business in New York and the property being held by Drawbridge U.S. is located in New York.

32.    This Court has personal jurisdiction over FIG LLC pursuant to CPLR § 301 because FIG LLC does business in New York.

33.    This Court has personal jurisdiction over the Director Defendants pursuant to CPLR § 301 because each of Messrs. Cummins, Dakolias and Furstein is a resident of New York and works in New York.

34.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because one or more of the Defendants resides in the Southern District of New York and all Defendants are residents of New York.  In addition, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the conduct and events giving rise to the Liquidators' claims took place in the Southern District of New York, and also because a substantial part of the property that is the subject of this action is situated in the Southern District of New York.

## STATEMENT OF FACTS

### The Octaviar Group

35.     Prior to OA's collapse, the business of the Octaviar Group consisted of several different business units, including a group of companies dedicated to the travel and tourism business (*i.e.*, the Stella Group), a corporate and investment banking business, a funds management business and a structured finance and advisory business. At its height, the Octaviar Group consisted of over 400 companies, employed over 3,000 employees, and had offices in Australia, New Zealand and the United Arab Emirates.

36.     The Stella Group, which is the conglomeration of companies that was ultimately sold by the Octaviar Group, comprised a number of travel and leisure businesses, including brands known as Breakfree, Peppers, Outrigger and Protea. The Stella Group was divided into two primary divisions:  (a) Stella Hospitality Group and (b) Stella Travel Services. Stella Hospitality Group owned and operated a portfolio of accommodation facilities in Australia and New Zealand under various brands. Stella Travel Services included retail and wholesale tourism businesses such as retail travel agencies, online travel booking and information platforms, call centers and wholesale holiday packaging.

37.     OL (formerly known as MFS Limited) was the ultimate holding company of the various companies that comprised the Octaviar Group. OL's primary function as the ultimate holding company of the Octaviar Group was to manage the affairs of all of the companies within the Octaviar Group.

38.     OA acted as the treasury company for the Octaviar Group and provided services to OL (its ultimate parent company) and other companies within the Octaviar Group. Among the services OA provided were:

        (a)     accounting, clerical and company secretarial services;

     (b)     receiving and recovery of accounts receivable;

     (c)     payment and deposit facilities; and

     (d)     general business resources.

39.     At all relevant times, Anderson and White were directors of OA.[4]  See Ex. B, at ¶¶ 9-10.  They also had many other roles within the Octaviar Group:  (a) Anderson was the CFO and company secretary of OL, and (b) White was the deputy CEO of OL from February 1, 2007 through January 20, 2008 and the CEO of OL between January 20, 2008 and May 3, 2008.  *Id.* at ¶¶ 9-10.  Anderson and White were also directors of Castle and various other companies within the Octaviar Group, including Sunleisure Group Pty Ltd (**"Sunleisure"**) and Stella Holdings Pty Limited (**"Stella Holdings"**).  *Id.*

40.     Anderson and White became accustomed to taking direction from and acting at the behest of Fortress and FIGA (acting through Kelleher and Kwei), who were controlled, directed and supervised by the Defendants.  The Defendants dominated, controlled and made all major decisions for Fortress and FIGA.  Further, in their capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.  In the Australian Fortress Lawsuit, the Liquidators have asserted claims against Anderson and White for breaches of their fiduciary and other duties as directors of OA.  See Ex. B (Statement of Claim).

---

[4]     Other directors of OA had resigned by late February 2008.  These included David Kennedy (who ceased to be a director on February 25, 2008) and Michael King (who ceased to be a director on June 25, 2007).  Kim-Lee Anne Kercher ceased to hold the position of company secretary on February 25, 2008.

**The Defendants Dominated and**
**Controlled Fortress and FIGA**

41.    The Defendants used Fortress and/or FIGA to transact their business with the Octaviar Group in Australia. The Defendants approved any transaction entered into by Fortress with the Octaviar Group, including the Castle Facility and related transactions. FIG LLC is the ultimate parent company of FIGA, the manager of Fortress. The Drawbridge Funds provided Fortress with funds used to make loans in Australia, including the Castle Facility.[5] And, as demonstrated by the testimony of Fortress's Kwei at a December 15, 2010 examination conducted in Australia before the Australian Court in connection with the OA Liquidation Proceeding, all major decisions for both Fortress and its management company, FIGA, were made in New York by the Defendants, wearing their multiple hats. Kwei testified as follows:

Q: [W]ho within Fortress decides the interest rate to charge? Is that a decision that you take or Mr. Kelleher takes or both of you?

A: I think we have a discussion about it, but it's approved - it's approved by New York.

Q: And what about fees that are charged, who decides the fees?

A: I think we - we look at it as one package. So interest fees - so there's a discussion of the team and a recommendation to New York.

Q: So all major decisions [sic] ultimately taken by New York?

A: They are approved by New York, yes.

Q: Approved by New York. So if a facility is extended, for example, that has got to be approved by New York?

A: That's correct.

Q: All right. And if more money is advanced, that has got to be approved by New York?

---

[5]    Fortress also obtained funds to make loans pursuant to a credit facility provided by the National Australia Bank (the **"NAB Facility"**).

A: That's correct, unless it's already built into the facility.

42.     In addition, Kelleher, the CEO of FIGA and a director of Fortress and each of the other Australian Fortress Entities, testified at a December 6, 2012 examination before the Federal Court of Australia (New South Wales District) in connection with the OA Liquidation Proceeding that each of the Director Defendants was involved in making decisions on behalf of Fortress. Kelleher testified as follows:

Q: And of those people I've mentioned [who are directors of Fortress], Mr. Noble, Mr. Cummins, Mr. Dakolias and Mr. Furstein, how many of those would you say are involved in running the Drawbridge funds in the United States?

A: Privilege. All of them.

Q: Okay. And you're the only director of FCCA II [*i.e.*, Fortress] who's based in Sydney; is that correct?

A: Privilege. Yes.

Q: So when you have board meetings, do they take place by conference call?

A: Privilege. Typically, yes.

. . .

Q: [I]s it correct to say that you and Mr. Dakolias are the principle [sic] decision-makers on behalf of FCCA II [Fortress]?

A: Privilege. No.

Q: So you get input from those other directors?

A: Privilege. As and when it's required, yes.

Q: How do you get the views of those other directors?   How are they communicated to you, in writing?

A: Privilege. Not typically.

Q: They're conveyed to you by telephone, for example?

A: Privilege. Typically.

43.     Fortress's normal business practice was to remit back to the Drawbridge Funds in New York funds that it received from the repayment of loans made by Fortress in Australia.[6]  As Kwei testified at his December 15, 2010 examination before the Australian Court in connection with the OA Liquidation Proceeding:

Q: So who in New York gets the money?

A: The funds [*i.e.*, the Drawbridge Funds].  So you described before that the

   funds are sent from New York ---

Q: Yes, okay.  So, first of all, the funds come from New York to FCC (Australia)

   II [*i.e.*, Fortress] to then on-lend?

A: That's correct.

Q: So who in New York sends the money?

A: It's the Drawbridge Special Opportunities Fund.

44.     Kwei further testified at a May 29, 2012 examination before the Federal Court of Australia (New South Wales District) in connection with the OA Liquidation Proceeding that funds received by Fortress to repay loans made by Fortress are remitted to the Drawbridge Funds:

Q: What was the commercial rationale for that substantial asset disposal
   program?

A: . . . The main one that I am aware of is in relation to the ownership structure
   of FCCA2 [Fortress].  It is wholly owned by two ultimate beneficiaries. Those

---

[6]     Fortress also used funds it received from the repayment of loans to pay down the NAB
        Facility.  See testimony of Kelleher quoted at paragraph 45 below.

beneficiaries are different funds and that structure that is in place with FCCA2 is rigid in a way that assets are divided up between those funds. The asset disposal from SCCA2 [sic] to two alternative entities that I have already mentioned, allows a lot more flexibility in transferring of assets between funds.

Q: Right. Now if I could just clarify a couple of aspects of that. You referred to two ultimate beneficiaries. Are they funds known as the drawbridge funds?

A: Yes, that's correct.

Q: You said that the asset disposals were to entities you have already mentioned. Is that a reference to FCCD Australia, FCCO Australia, and FCCO2? ---

A: Privilege. Yes, that's right.

. . .

Q: Now, you gave some evidence earlier about the two Drawbridge funds, which you said were the – I think you described them as the ultimate beneficiaries. That is the two funds, is it, identified as Drawbridge Special Opportunities Fund LP and Drawbridge Special Opportunities Fund Limited?

A: Privilege. Yes, that's correct.

45.     Kelleher concurred with Kwei's testimony at his deposition before the Australian Court in connection with the OA Liquidation Proceeding on February 8, 2011:

Q: And when a loan is repaid by a borrower of FCC2 [sic] [Fortress], are the funds remitted to the United States?

A: It depends, yes, partly to the United States. Partly it can be reused to repay debt facility [i.e., the NAB Facility].

. . .

Q: So if they're not used to repay a creditor . . . then they're sent back to New York, is that right?

A: Yes. Yes.

46.     Because the Drawbridge Funds provided financing through Fortress to various companies within the Octaviar Group, Kelleher and Kwei (both of whom worked at the offices of Fortress and FIGA in Australia) communicated regularly with the Octaviar Group, particularly

OA directors Anderson and White, and received detailed information about the Octaviar Group's financial condition. *E.g.*, Ex. B, at ¶¶ 40B, 43, 51. In turn, Kelleher and Kwei also had regular discussions with the Defendants in New York, including weekly Wednesday morning telephone conferences and additional telephone and email communications to discuss matters relating to the Octaviar Group.

47.   As set forth in detail below, the Defendants ultimately leveraged their knowledge and understanding of the Octaviar Group's deteriorating financial condition, their dominion and control over Fortress and FIGA and their undue influence and control within the Octaviar Group to divert, to Fortress and ultimately the Drawbridge Funds, the Stella Sale Proceeds that belonged to OA and rightfully should have been remitted to OA.

**Fortress Entered Into the Octaviar
Group's Castle Facility**

48.   At the direction and with the approval of the Defendants, pursuant to the Castle Facility, dated June 1, 2007, Fortress loaned $250 million to Castle (one of the members of the Octaviar Group).[7] See Ex. B, at ¶ 11. The Castle Facility had a three-month maturity ending on September 1, 2007. *Id.* at ¶ 13. OL and MFSL guaranteed the obligations of Castle under the Castle Facility. *Id.* at ¶ 11b.

49.   OL executed a fixed and floating lien, dated June 1, 2007 (the "**Fortress Lien**"), in favor of Fortress as security for OL's obligations as a guarantor under the Castle Facility. *Id.* at ¶ 12. The Fortress Lien was a lien over the assets of OL (but <u>not</u> OA). The assets of Castle and MFSL were also pledged as collateral to secure Castle's obligations under the Castle Facility.

---

[7]   Castle was formerly known as MFS Investment Holdings No. 17 Pty Ltd and was renamed MFS Castle Pty Ltd. and then Octaviar Castle Pty Ltd.

50.    The Castle Facility provided Fortress with significant leverage over OL, MFSL and Castle, and required each of those entities to provide Fortress with detailed financial information regarding the Octaviar Group. Pursuant to the terms of the Castle Facility:

(a)    OL and MFSL unconditionally and irrevocably guaranteed jointly and severally to Fortress the payment and satisfaction of the obligations under the Castle Facility;

(b)    if Castle did not pay or satisfy any of its obligations under the Castle Facility when due, OL and MFSL had to immediately, on demand by Fortress, pay or satisfy such obligations to or at the direction of Fortress;

(c)    OL, Castle and MFSL were obliged to deliver to Fortress, not later than 10 business days after the end of each month, monthly management accounts of OL and the other companies in the Octaviar Group, including profit and loss statements, balance sheets and statements of cash flow;

(d)    OL could not, without the prior written consent of Fortress, provide financial accommodation to related companies, or allow any indebtedness owed to OL by related companies to remain outstanding; and

(e)    OL could not, without the prior written consent of Fortress, make any loans, grant any credit or give any guarantee to or for the benefit of any person.

See *id.* at ¶ 14.

51.    OA was not a party to or a guarantor under the Castle Facility.

52.    Based on their detailed knowledge of the Octaviar Group's financial position, the Defendants, Fortress and FIGA eventually became aware that their ability to get repaid on the Castle Facility was in peril. The Defendants, Fortress and FIGA came to appreciate and

understand that in the absence of a sale of the Stella Group, OL and Castle did not have sufficient liquidity to repay the Castle Facility. Indeed, on November 26, 2007, OL provided Fortress and FIGA with financial information showing that the cash position of the Octaviar Group, including OL but excluding the Stella Group, was approximately $40 million.

**Only OA Had Intercompany Loans to
the Stella Group and, Therefore, OA
Was Entitled to Receive All of the
Stella Sale Proceeds**

53.    During the first half of 2007, the Octaviar Group and CVC Asia Pacific Limited ("**CVC**") discussed a potential sale or partial sale of the Stella Group. See Ex. B, at ¶ 16. In order to facilitate the anticipated sale of the Stella Group as a separate business unit from the Octaviar Group, on June 28, 2007, the Octaviar Group effectuated a restructure (the "**Stella Restructure**").

54.    The Stella Restructure involved:

(a)    the refinancing, through a UBS facility, of external debt that the Stella Group owed to unrelated third parties (*i.e.*, parties unrelated to any entity in the Octaviar Group) as of June 28, 2007;

(b)    the transfer of shares in certain Stella Group entities to Stella MLR Group Pty Ltd ("**Stella MLR**") and Stella Group Holdings Pty Limited ("**SGH**"), which was incorporated to act as a holding company to the restructured Stella Group; and

(c)    the incorporation of Stella Holdings and a chain of three wholly owned subsidiaries between Stella Holdings and SGH, known as Stella Holdings No. 1 Pty Limited ("**Stella No. 1**"), Stella Holdings No. 2 Pty Limited ("**Stella No. 2**") and Stella Holdings No. 3 Pty Limited ("**Stella No. 3**").

*Id.* at ¶ 17.

### A.   The Refinancing of the Stella Group's External Debt "Locked In" OA as the Only Entity in the Octaviar Group with Intercompany Loans to the Stella Group

55.   The refinancing of the Stella Group's external debt was effected by (among other things) a Senior Subscription Agreement, dated June 28, 2007 (the **"UBS Subscription Agreement"**), among Stella Holdings, UBS AG, Australia Branch (as mandated lead arranger, underwriter and facility agent) and UBS Nominees Pty Limited (**"UBS"**), as security trustee. See Ex. B, at ¶ 19.  The UBS Subscription Agreement included loan facilities in a total amount of more than $1.1 billion.

56.   As part of the Stella Restructure, all intercompany loans between the Stella Group and the Octaviar Group were to be subordinated to the UBS loan facilities.  In connection with its entry into the UBS loan facilities, UBS made it clear that it required that all such intercompany loans be documented, so that it could ensure that there was no inconsistency between the intercompany loans and the subordination arrangements.  In part to meet the requirements of UBS, Freehills (acting as solicitors for the Octaviar Group) prepared a short form agreement to document the intercompany loans between the Octaviar Group and the Stella Group.  The short form agreement showed that OA was the lender under each intercompany loan to the Stella Group — and the only intercompany lender to the Stella Group.  These OA loans to the Stella Group are described below.

57.   On June 28, 2007, pursuant to a Subordination Deed (the **"Subordination Deed"**), the rights of the Octaviar Group with respect to any liabilities owing to them by the Stella Group were subordinated to the rights of UBS under the UBS Subscription Agreement.

58.   The effect of the Subordination Deed was that all loans from OA to the Stella Group were subordinated to the rights of UBS under the UBS Subscription Agreement.  Nor

could any loans from OA to the Stella Group be assigned, transferred or novated without UBS's prior written consent. In addition, the Subordination Deed prohibited OA from receiving funds from the Stella Group in reduction of the loans owed to it by the Stella Group. Thus, the Subordination Deed had the effect of "locking in" the intercompany loan position between the Stella Group and the Octaviar Group as of June 28, 2007. As described further at paragraph 64 below, on June 28, 2007, OA director Anderson informed senior staff in the Octaviar Group and the Stella Group that, going forward, the Octaviar Group would not be extending any credit to the Stella Group whatsoever. *Id.* at ¶ 23A.

59.     At all relevant times following the Stella Restructure, OA was the only company within the Octaviar Group (excluding entities within the Stella Group) that had any substantial loans to the Stella Group. *Id.* at ¶ 31A. More particularly, no company in the Stella Group had any, or any substantial, indebtedness to OL (*i.e.*, the guarantor under the Castle Facility). *Id.* at ¶ 32. All told, OA had between $736,739,012 and $1,335,031,178 in outstanding intercompany loans to companies within the Stella Group.

**B.     OA's Loans to the Stella Group**

60.     As part of the Stella Restructure, on June 28, 2007, SGH and Stella MLR acquired shares of certain Stella Group entities pursuant to the following share sale and purchase agreements:

> (a)     SGH entered into a Share Sale Agreement (the "**SGH Share Sale Agreement**") to purchase from OL all of the shares of MFS Leisure Resort Holdings Pty Limited ("**LRH**") and Stella Travel Services Pty Limited ("**STS**") for a purchase price equal to the fair value of the shares in LRH and STS, which was to be determined by the CFO of OL (*i.e.*, Anderson);

(b)   Stella MLR entered into a Share Sale Agreement (the **"Breakfree Share Sale Agreement"**) to purchase all of the shares of Breakfree Asset Holdings Limited (**"Breakfree"**) from a related entity known as McLaughlins Financial Services Limited for a purchase price of $9,950,000; and

(c)   Stella MLR entered into a Share Sale Agreement (the **"Sunleisure Share Sale Agreement"**) to purchase all of the shares of Sunleisure Hotels & Resorts Pty Ltd and Sunleisure Operations Pty Ltd (collectively, the **"Sunleisure Entities"**) from Sunleisure for a purchase price of $48,209,053.[8]

See *id.* at ¶ 20.

61.   Consistent with its role as the Octaviar Group's treasury company, OA financed the purchase of shares under each of the SGH Share Sale Agreement, the Breakfree Share Sale Agreement and the Sunleisure Share Sale Agreement (collectively, the **"Restructure Share Agreements"**). *Id.* at ¶ 22. More specifically, on June 28, 2007, OA made loans to SGH and Stella MLR pursuant to the following three loan agreements:

(i)   OA and SGH entered into a Loan Agreement (the **"SGH Loan Agreement"**), pursuant to which OA made a loan to SGH for the acquisition of LRH and STS in an amount that was to be determined by the CFO of OL (*i.e.*, Anderson) in accordance with the SGH Share Sale Agreement. By no later than October 2007, the purchase price for the transfer of shares in LRH and STS under the SGH Share Sale Agreement

---

[8]   The purchase price for Sunleisure was subsequently adjusted to $47,209,053 by an undated acknowledgment. *Id.* at ¶ 25B.

and thereby the corresponding loan from OA to SGH under the SGH Loan Agreement was determined to be $305,008,291. *Id.* at ¶ 26. SGH's obligation to pay OL the purchase price for the sale of its shares in STS and LRH was discharged. *Id.* at ¶ 28(c).

(ii)    OA and Stella MLR entered into a Loan Agreement (the "**Breakfree Loan Agreement**"), pursuant to which OA loaned $11,050,000 to Stella MLR for the acquisition of Breakfree; and

(iii)    OA and Stella MLR entered into a Loan Agreement (the "**Sunleisure Loan Agreement**"), pursuant to which OA loaned $48,209,053 to Stella MLR for the acquisition of the Sunleisure Entities.

See *Id.* at ¶ 22.

62.    On June 28, 2007, OA also entered into a fourth loan agreement with LRH (the "**LRH Loan Agreement**" and together with the SGH Loan Agreement, the Breakfree Loan Agreement and the Sunleisure Loan Agreement, the "**OA Stella Loan Agreements**"). *Id.* Pursuant to the LRH Loan Agreement, various loans from OA to the Stella Group were agreed to be treated as an aggregated loan from OA to LRH in the amount of $373,471,668. *Id.*

63.    The Stella Restructure set the stage for the sale of the Stella Group as a separate business unit. Critically, after the Stella Restructure, OA was the only company in the Octaviar Group (outside of the Stella Group) that had any, or any material, loans to the Stella Group. Fortress did not have any debts to the Stella Group.

64.    Following the Stella Restructure, on June 28, 2007, OA director Anderson sent an email with the subject "Stella – a new world" to senior staff in the Octaviar Group and the Stella Group. *Id.* at ¶ 23A. Anderson's email emphasized that the UBS loan facilities placed a range of restrictions on the Stella Group's activities and that going forward, the Octaviar Group would

not be extending any credit to the Stella Group whatsoever. *Id.* The position set forth in Anderson's email was contractually required under the terms of the Subordination Deed and reflected that the restructured Stella Group was intended to be an independent group within the Octaviar Group that would be sold to a third party purchaser.

**August Through November 2007:**
**Fortress Used the First and Second**
**Amendments to the Castle Facility**
**to Improve Its Position**

65.     Liquidator Katherine Elizabeth Barnet submitted an affidavit in the Australian Fortress Lawsuit to the Australian Court on September 15, 2012 (the "**Barnet Affidavit**"). See Ex. C hereto (Barnet Affidavit). As stated in the Barnet Affidavit:

> In an email from Kelleher to Dakolias dated [August 16,] 2007, . . . Kelleher noted that the Octaviar Group's "[c]urrent cash position is $20MM".

*Id.* at ¶ 54. Thus, the Defendants knew that OL and Castle did not have sufficient liquidity to repay the $250 million Castle Facility to Fortress by its original September 1, 2007 maturity date.

66.     On or about August 17, 2007, Fortress, Castle, OL and MFSL entered into the Deed of Amendment to the Castle Facility (the "**First Deed of Amendment**"). See Ex. B, at ¶ 33. The First Deed of Amendment provided that:

(a)     the maturity date of the Castle Facility was extended by three months to December 1, 2007;

(b)     it was an event of default (the "**Share Price Default**") for the five (5) day volume weighted average share price of OL on the Australian Securities Exchange to fall below $3.20; and

(c)     OL was required to deliver to Fortress, not later than 30 business days after the end of each month, monthly management accounts of Stella

Holdings and each of its subsidiaries (*i.e.*, the Stella Group), including

profit and loss statements, balance sheets and statements of cash flow.

See Ex. B, at ¶ 34.

67.     The Defendants continued to receive frequent and detailed financial information

through Fortress and/or FIGA about the Octaviar Group's financial position from November

2007 to February 2008, including information relevant to the Octaviar Group's ability to pay its

debts as they came due.  For example, on November 26, 2007, OL provided Fortress and FIGA

with financial information showing that the opening cash position of the Octaviar Group,

including OL but excluding the Stella Group, for that day was approximately **$40 million**, which

again would not be sufficient to repay the $250 million Castle Facility to Fortress.

68.     On November 30, 2007, Castle, Fortress, OL and MFSL entered into the second

Deed of Amendment to the Castle Facility (the **"Second Deed of Amendment"**), pursuant to

which:

(a)     Castle agreed to repay $100 million of the $250 million to Fortress on that

date;[9]

(b)     the maturity date of the Castle Facility was extended to February 29, 2008;

and

(c)     Castle paid Fortress certain extension and maintenance fees relating to the

Castle Facility, including an upfront extension fee of $3 million.

See *id.* at ¶ 36.

---

[9]     Although the opening cash position of the Octaviar Group was only $40 million as of
November 26, 2007, OL took funds from the Premium Income Fund — an investment
fund managed by the Octaviar Group — in order to pay Fortress $100 million pursuant to
the Second Deed of Amendment.  The removal of such funds from the Premium Income
Fund is the subject of litigation in Australia.

69.     The First Deed of Amendment and the Second Deed of Amendment were approved by the Defendants (acting through Fortress and/or FIGA).

**The Sale of the Stella Group Diverted Funds from OA
for the Benefit of Fortress and Ultimately the Drawbridge
Funds; Collapse of the Octaviar Group**

70.     On January 18, 2008, OL announced to the market that it intended to separate the Stella Group from the Octaviar Group and to raise an additional $550 million in equity.  See *id.* at ¶ 37. Immediately following that announcement, OL's share price on the Australian Securities Exchange declined from $3.18 to $0.99.  The trading of OL's shares was then suspended.  *Id.* at ¶ 38.  This suspension from trading was never lifted.  *Id.*

71.     Two days later, on January 20, 2008, CVC made a binding offer to acquire 65% of the Stella Group for $400 million (the "**CVC Binding Offer**").  *Id.* at ¶ 39.  The CVC Binding Offer provided that the external debt that the Stella Group owed to UBS under the UBS Subscription Agreement would remain in place.  *Id.*  The CVC Binding Offer further provided that all intercompany liabilities relating to the Stella Group would be extinguished prior to the consummation of the sale, including the intercompany loans from OA.  *Id.*

72.     On January 21, 2008, Fortress wrote to Castle (copied to OL and MFSL in their capacity as guarantors) to notify it that a Share Price Default had occurred under the Castle Facility on account of the five (5) day weighted average share price of OL falling below $3.20.  *Id.* at ¶ 40.  Fortress notified Castle that it waived its rights with respect to any event of default or potential event of default under or relating to the Castle Facility until February 4, 2008.  *Id.*

73.     On January 21, 2008, Fortress also wrote to a company within the Octaviar Group known as Young Village Estates Pty Limited ("**YVE**") and OL to notify them that an event of default had occurred under a $53.5 million loan facility (the "**YVE Facility**"), dated May 31, 2007, between Fortress, as lender, and YVE, as borrower.  OL had guaranteed YVE's

obligations under the YVE Facility pursuant to a Guarantee and Indemnity, dated May 25, 2007. In its letter to YVE and OL, Fortress requested that YVE pay down the YVE Facility by $15 million by no later than February 4, 2008.  Neither YVE nor OL (in its capacity as guarantor) complied with Fortress's request to repay $15 million under the YVE Facility.

74.     Fortress, FIGA and the Defendants were concerned that Fortress did not hold adequate collateral security to cover the amounts outstanding under the Castle Facility and the YVE Facility.  Accordingly, on January 22, 2008, the Defendants (acting through Fortress and/or FIGA) requested that Anderson and White execute a letter agreement (the "**Fortress Lien Extension**") that would extend the Fortress Lien to cover OL's obligations as guarantor under the YVE Facility.  See *id.* at ¶ 86A.  As set forth in the Barnet Affidavit and the Statement of Claim, that same day, Kwei stated in an email to Kelleher that:

> "Next time you speak to Craig [White], you need to confirm with him if they are going to run out of cash".

See *id.*; Ex. C (Barnet Affidavit), at ¶ 92.  Anderson and White agreed to the Fortress Lien Extension on or about January 24, 2008.

75.     On January 24, 2008, Fortress and FIGA director Kelleher sent Defendant Dakolias a liquidation assessment for the Octaviar Group (the "**Fortress Liquidation Assessment**").  The Fortress Liquidation Assessment ascribed a net value of $500 million to the Stella Group and appeared to ascribe a net value of $180 million to the balance of the Octaviar Group, *i.e.*, the Octaviar Group without the Stella Group.

76.     By January 24, 2008, the Defendants knew that Fortress and ultimately the Drawbridge Funds would not be able to be repaid on the Castle Facility.  Based on a statement of cash flow that Anderson provided to Fortress and FIGA on January 24, 2008, Fortress, FIGA and the Defendants plainly understood that Fortress would not be paid the next installment of interest under the Castle Facility.

61844353.docx                                    27

77.     On February 1, 2008, Castle and OL confirmed to Fortress that the interest payable under the Castle Facility for January would not be paid on time.  That same day, Kwei, Kelleher and Nicholas Slack (another officer of Fortress) met with Mark Korda of Korda Mentha and 333 Capital Pty Limited, an insolvency specialist who had been retained by the Octaviar Group.  At the meeting, Mr. Korda stated that the Octaviar Group had only $3 million of cash in the bank and that JP Morgan, which was owed $6 million, had threatened to wind up OL.  See Ex. C (Barnet Affidavit), at ¶ 113.  The Fortress and Octaviar Group representatives participating in the meeting discussed possible transactions "so as to keep [OL] alive", and Mr. Korda stated that any transaction involving Fortress would need to be structured so that it did not appear that Fortress was "being afforded preferential treatment."  *Id.*

78.     On February 3, 2008, Global Voyager Pty Limited, a subsidiary of CVC ("**Global Voyager**"), as purchaser, Stella Holdings, as seller, and OL, as guarantor, entered into a Share Sale Agreement (the "**Stella Share Sale Agreement**").  See Ex. B, at ¶ 41.  The Stella Share Sale Agreement provided that Global Voyager would pay a purchase price of $400 million (*i.e.*, the Stella Sale Proceeds) to acquire 65% of the Stella Group, with the Octaviar Group to retain an ongoing interest in the remaining 35% of the Stella Group.  *Id.* at ¶¶ 39, 42.  The Stella Share Sale Agreement also provided that:

(a)     prior to closing, Stella Holdings would cause all intercompany loans to any company in the Stella Group from any company in the Octaviar Group to be extinguished or otherwise cancelled; and

(b)     Stella Holdings was required to cause each "Seller Group Member, the Company and each Transaction Entity" (which included OA) to enter into a deed of release (the "**Deed of Release**"), effecting a release of all intercompany loans from the Octaviar Group to the Stella Group,

including the loans from OA in an amount between $737 million and $1.34 billion.

*Id.*

**The Castle Facility Was Amended So That
Fortress Could Arrogate to Itself and Ultimately
the Drawbridge Funds Stella Sale Proceeds to
Which OA Was Rightfully Entitled**

79.    On February 4, 2008, Fortress received information showing that the Stella Group and the Octaviar Group were required to release all intercompany loans pursuant to the Stella Share Sale Agreement.  At all times following the Stella Restructure, the Defendants, Fortress and FIGA were well aware that (a) OA was the only company in the Octaviar Group that had any, or any substantial, loans to companies in the Stella Group; and (b) no company within the Stella Group had any, or any substantial, indebtedness to OL or Sunleisure.  See Ex. B (Statement of Claim), at ¶ 43b.  Furthermore, Fortress was not a creditor of the Stella Group or OA and did not hold a security interest in the assets of the Stella Group or OA.  See Ex. B, at ¶¶ 72, 88.

80.    On February 18, 2008, Castle, MFSL, OL, and Fortress entered into the third Deed of Amendment to the Castle Facility (the "**Third Deed of Amendment**").  *Id.* at ¶ 44.  At the time of entry into the Third Deed of Amendment, the Defendants knew that Castle and OL had defaulted under the Castle Facility based on the Share Price Default and also the failure to make the January interest payment under the Castle Facility.  *Id.* at ¶ 44A.  The Third Deed of Amendment provided that:

(a)    the maturity date of the Castle Facility was extended to the earlier of March 31, 2008 or the closing of the Stella Share Sale Agreement;

(b)    the principal amount of the Castle Facility was increased from $150 million to $200 million, and various fees were payable to Fortress;

(c)     Castle agreed to pay $15 million to Fortress under a funded participation agreement relating to the YVE Facility;

(d)     OL was required to ensure that any member of the Octaviar Group (including OA) not forgive any intercompany loans; and

(e)     OL was required to not make or permit a member of the Octaviar Group to make any individual payment of more than $50,000 or aggregate payments of more than $1.5 million in any calendar week.

*Id.* at ¶ 45.

81.     The effect of the Third Deed of Amendment was that OL was required, under the terms of the Castle Facility (as amended), to obtain the consent of Fortress (acting at the direction of the Defendants) to forgive any intercompany loans between OA and the Stella Group. *Id.* Because the Stella Share Sale Agreement required the OA intercompany loans to the Stella Group to be extinguished as a condition to the closing of the Stella Share Sale Agreement, the Third Deed of Amendment essentially gave Fortress, FIGA and the Defendants the right to block the closing of the Stella Group sale. *Id.* at ¶ 46.

82.     Of the $50 million in funds extended under the Third Deed of Amendment, $24 million were paid directly to Fortress for interest, fees and the $15 million repayment under the YVE Facility. *Id.* at ¶ 168. In addition, $20 million in funds (the "**Baker & McKenzie Funds**") extended under the Third Deed of Amendment were paid into a trust account held by Fortress's counsel (Baker & McKenzie). *Id.*

83.     The Baker & McKenzie Funds were advanced to the Octaviar Group solely at the discretion of the Defendants (acting through Fortress and/or FIGA). *Id.* The Defendants caused Fortress and/or FIGA to approve the payment only of those obligations necessary to prevent the

Octaviar Group from being the subject of insolvency proceedings until after the Castle Facility was repaid.

84.     Thus, the Defendants exerted undue control over the Octaviar Group by keeping the Octaviar Group on life support until the obligations owing to Fortress were repaid and available to be repatriated to the Drawbridge Funds in New York.   The Defendants and/or Fortress did not otherwise fund the Octaviar Group with any long- or medium-term objective of achieving or maintaining the Octaviar Group's solvency. *Id.* at ¶ 181.

85.     For example, on February 15, 2008, the Octaviar Group provided Fortress and FIGA with a list of debts then due and payable by the Octaviar Group in the amount of $9,171,857.16 (the "**First List of Creditors**").   *Id.* at ¶ 165.   On February 18, 2008, the Defendants caused Fortress and/or FIGA to consent to the payment of only approximately $5.55 million out of the more than $9.17 million in debts identified on the First List of Creditors. *Id.* at ¶ 172.

86.     On February 22, 2008, the Octaviar Group provided Fortress and FIGA with a second list of debts then due and payable by the Octaviar Group in the amount of $5,612,707.23 (the "**Second List of Creditors**").   *Id.* at ¶ 174.   On February 25, 2008, the Defendants caused Fortress and/or FIGA to instruct the Octaviar Group that the oldest debts were to be paid first. *Id.* at ¶ 175b.   The Defendants caused Fortress and/or FIGA to further instruct the Octaviar Group to pay certain debts owed by the Octaviar Group after the completion of the Stella Share Sale Agreement. *Id.* at ¶ 175a.

87.     On February 26, 2008, the Octaviar Group requested an immediate drawdown of $1.5 million under the Castle Facility in order to pay certain debts and wages. *Id.* at ¶ 176.   The Defendants (acting through Fortress and/or FIGA) approved the drawdown of $1.5 million under the Castle Facility and transferred the requested funds to the Octaviar Group. *Id.* at ¶ 177.   That

same day, the Octaviar Group submitted an additional list of debts then due and payable by the Octaviar Group in the amount of $755,716.11 (the "**Third List of Creditors**"). *Id.* at ¶ 178. The Defendants (acting through Fortress and/or FIGA) approved the payment of the debts identified in the Third List of Creditors. *Id.* at ¶ 179.

88.    The board of directors of OA (the "**OA Board**"), and in particular Anderson and White, acted in accordance with the directions, instructions and wishes of Fortress, FIGA and the Defendants, in causing OA to pay only those debts approved by Fortress and/or FIGA. *Id.* at ¶ 180.

**The Defendants Improperly Caused OA to Release
Its Intercompany Loans to the Stella Group
Without Any Assurance that OA Would Receive
Any Consideration, Let Alone Fair Consideration**

89.    On February 27, 2008, the Octaviar Group sent Fortress a draft Deed of Release (the "**Draft Deed of Release**") in connection with the anticipated sale of the Stella Group. Ex. B, at ¶ 46B. The Draft Deed of Release (which was to be signed by OL, OA, Stella Holdings and others) recorded as intercompany loans made to the Stella Group only loans from OA and no intercompany loans from OL. *Id.* The Deed of Release provided for the release of OA's intercompany loans to the Stella Group under the Stella Loan Agreements, as required by the Stella Share Sale Agreement. *Id.* at ¶¶ 42, 59.

90.    After receiving the Draft Deed of Release, the Defendants caused Fortress and/or FIGA to demand the execution of a separate deed (the "**Stella Proceeds Deed**"), providing for the repayment of the Castle Facility directly out of the Stella Sale Proceeds. *Id.* at ¶ 47. The Defendants **insisted upon** the execution of the Stella Proceeds Deed as a condition to the Defendants (acting through Fortress and/or FIGA) consenting to the Deed of Release being executed and thus allowing the sale of the Stella Group to close. *Id.*

91.     The Defendants drafted and/or caused Fortress and their counsel, Baker & McKenzie, to draft the Stella Proceeds Deed, which purported to set out information concerning the internal affairs of the Octaviar Group and the Stella Group, particularly the exact intercompany loan position between them.  The Stella Proceeds Deed was inconsistent with the Draft Deed of Release with respect to the intercompany loan position between the Stella Group and the Octaviar Group — and, specifically, the fact that OA was the only member of the Octaviar Group that had intercompany loans to the Stella Group.  *Id.* at ¶ 47A.  Whereas the Draft Deed of Release listed only four "Intra-group Loan Agreements," each of which was between OA and a Stella Group company, recitals H through K to the Stella Proceeds Deed falsely stated that:

> H     LRH is a subsidiary of Stella Holdings and owes $818,620,211.13 to [OL] by way of inter-company loan (**Leisure Holdings (MFS) Loan**).
>
> I     LRH owes $517,604,366.50 to OA by way of inter-company loan (**MFS Administration Loan I**).
>
> J     STS owes $18,684,052.45 to OA by way of inter-company loan (**MFS Administration Loan II**).
>
> K     LRH owes $43,309,973.00 to Sunleisure by way of inter-company loan (**Leisure Holdings (Sunleisure) Loan**).

*Id.* at ¶¶ 47, 49.

92.     These recitals to the Stella Proceeds Deed were blatantly incorrect.  The only intercompany loans identified in the Draft Deed of Release prepared by the Octaviar Group were the intercompany loans between OA and the Stella Group.  *Id.* at ¶ 47A.  In contrast, the recitals to the Stella Proceeds Deed falsely stated that OL and Sunleisure were also lenders to the Stella Group.  *Id.* at ¶ 49.  Additionally, the Stella Proceeds Deed incorrectly stated that STS and LRH were the borrowers under OA's intercompany loans, while the Octaviar Group's Draft Deed of

Release correctly stated that the borrowers were SGH, Stella MLR and LRH under the OA Stella Loan Agreements. *Id.* at ¶¶ 47A, 49.

93.     Contrary to the Stella Proceeds Deed, LRH did not owe $818,620,211.13 (or any other amount) to OL, and LRH did not owe $43,309,973 (or any other amount) to Sunleisure. *Id.* at ¶ 53.

94.     The Stella Proceeds Deed provided, *inter alia*, that:

(i)     OA, OL and Sunleisure irrevocably release and discharge their alleged intercompany loans to the Stella Group;

(ii)    OL is liable to pay Fortress the "Amount Owing" under the Castle Facility;

(iii)   OL will pay the Amount Owing under the Castle Facility on the closing of the Stella Share Sale Agreement; and

(iv)    OL shall direct Stella Holdings (the seller) to pay the Amount Owing out of the proceeds of the Stella Share Sale Agreement and, in turn, Stella Holdings shall direct Global Voyager (the buyer) to pay the Amount Owing directly to Fortress at closing.

*Id.* at ¶ 52.

95.     The Defendants knew that the recitals to the Stella Proceeds Deed not only were inconsistent with the Deed of Release, but also were wrong. See *id.* at ¶ 51. The Defendants drafted and/or caused Fortress and their counsel (Baker & McKenzie) to draft the Stella Proceeds Deed at a time when the Defendants had serious concerns regarding the solvency of the Octaviar Group. That the Defendants were concerned about the insolvency of OA is demonstrated by the Defendants' refusal, as of March 5, 2008, to allow Fortress to release the Fortress Lien on the

basis that transactions relating to the Stella Share Sale Agreement and the Fortress Payment (as defined below) could be voidable under section 588FE of the Corporations Act. *Id.* at ¶ 79.

96.     On February 29, 2008, the Defendants caused Castle, OA, OL, MFSL, Stella Holdings and Fortress to execute the Stella Proceeds Deed as a condition to the Stella Share Sale Agreement being consummated. In other words, the Defendants and Fortress did not permit OL to sign the Deed of Release until the Stella Proceeds Deed was executed. Anderson and White signed the Stella Proceeds Deed on behalf of OA. *Id.* at ¶¶ 82-83. White signed the Stella Proceeds Deed as a director of Stella Holdings, the same day he became a director of that company. *Id.* at ¶ 54.

97.     The Stella Proceeds Deed was detrimental to OA and it was not in OA's interests to enter into it. *Id.* at ¶ 184.

98.     Significantly, the Stella Proceeds Deed was not approved by the OA Board, or the boards of OL, Stella Holdings or MFSL. *Id.* at ¶ 54b.

99.     In causing OA to enter into the Stella Proceeds Deed, Anderson and White did not exercise judgment or discretion of their own, but rather acted in accordance with directions and instructions given to them by Fortress and/or FIGA (acting through Kelleher and Kwei), who were controlled, directed and supervised by the Defendants, in order to have access to limited working capital in the short term to stave off the winding up of OL or other companies in the Octaviar Group. *Id.* at ¶ 185. As discussed above, the Defendants dominated, controlled and made all major decisions for Fortress and FIGA. Further, in their capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.

100.     Following the execution of the Stella Proceeds Deed, on February 29, 2008, OL, OA, Stella Holdings, Stella No. 1 and other parties executed the Deed of Release. *Id.* at ¶ 55.

The Deed of Release stated that OA released Stella MLR, LRH, and SGH from their respective obligations under the OA Stella Loan Agreements. *Id.* at ¶ 59.

101.   The Defendants, Fortress and FIGA sought no formal assurance from the directors of OA or any entity within the Octaviar Group that OA or any entity within the Octaviar Group would still be solvent if it entered into the Stella Proceeds Deed.  By contrast, when Fortress and FIGA entered into the Castle Facility and each of its amendments, the Defendants caused Fortress and FIGA to seek and obtain such assurances from Castle, OL, and MFSL in their respective capacities as the Borrower and Guarantors of the Castle Facility. See *id.* at ¶ 98.  In addition, the Defendants, Fortress and FIGA did not require formal assurances from the directors of OA or any entity within the Octaviar Group that entry into the Stella Proceeds Deed was in the best interests of OA, in contrast to the Castle Facility and each of its amendments, where similar assurances had been sought and obtained from Castle, OL and MFSL.  See *id.*

**The Defendants Dominated and Controlled the Activities of Fortress, FIGA, Kelleher and Kwei, Who in Turn Improperly Exercised Domination and Control over OL, OA and Anderson and White to Effect the Payment of Stella Sale Proceeds to Fortress**

102.   The closing of the Stella Share Sale Agreement occurred on February 29, 2008, following the execution of the Stella Proceeds Deed and the Deed of Release. Ex. B, at ¶ 57.

103.   By letter (the "**Allocation Letter**"), dated February 29, 2008, from Stella Holdings to the respective directors of OA, OL and Sunleisure, each of Stella Holdings, OA, OL and Sunleisure agreed as follows with respect to the distribution of the Stella Sale Proceeds:

(a)   they agreed that in consideration for the releases given by OL, OA and Sunleisure to the Stella Group, each of OL, OA and Sunleisure had an entitlement to the Stella Sale Proceeds and the Octaviar Group's 35% ongoing interest in the Stella Group (the "**Stella Assets**");

(b)     they agreed that (i) approximately $200 million of the Stella Sale Proceeds would be used by OL and Castle to repay the Castle Facility; (ii) OA would hold the remainder of the Stella Sale Proceeds (subject to the cash needs of the Octaviar Group) pending agreement on the appropriate allocation of the Stella Sale Proceeds; and (iii) Stella Holdings would hold the Stella Assets pending agreement with respect to the appropriate allocation of the Stella Assets; and

(c)     they agreed that the parties would negotiate in good faith to agree on the allocation of the Stella Assets and the remainder of the Stella Sale Proceeds, and that such negotiations would have regard to (i) the best interests of OL and the Octaviar Group; (ii) what is equitable between the parties in light of their contribution to the sale of the Stella Group; and (iii) the ongoing solvency of each of the parties.

104.    The effect of the Deed of Release, the Stella Proceeds Deed and the Allocation Letter was that (a) OA's interest in and 100% entitlement to the Stella Sale Proceeds (by reason of its intercompany loans) was diverted to Fortress without any assurance whatsoever that OA would be paid any consideration, let alone fair consideration; and (b) OA released between $737 million and $1.34 billion of intercompany loans to the Stella Group.

105.    The Allocation Letter was not approved by the OA Board or the boards of OL or Sunleisure. *Id.* at ¶ 61.

106.    The Allocation Letter did not provide any enforceable right in favor of OA with respect to the Stella Sale Proceeds. The Allocation Letter purportedly required OA to consider the best interests of OL and the Octaviar Group generally, as well as the ongoing solvency needs of OL and Sunleisure, when deciding what share (if any) OA was entitled to from the balance of

the Stella Sale Proceeds in circumstances where OA was insolvent and its directors ought to have been acting solely in the interests of OA and of its creditors. *Id.* at ¶ 73. The interests of OL and OA were in conflict with each other given the insolvency of OA at this time. *Id.*

107.    On February 29, 2008, Fortress received — at the Defendants' insistence — $189,897,919 in funds directly from the Stella Sale Proceeds (the "**Fortress Payment**"). See *id.* at ¶ 62. At the time of this transfer, and by virtue of OA's entry into the Stella Proceeds Deed, the Deed of Release and the Allocation Letter, OA was insolvent or rendered insolvent. *Id.*

108.    The Stella Sale Proceeds that Fortress received under the Fortress Payment were transferred (in whole or in part) to the Drawbridge Funds in New York, either directly from Fortress or indirectly through the other Australian Fortress Entities or other affiliates of the Drawbridge Funds.

109.    Of the remainder of the Stella Sale Proceeds after the Fortress Payment, a substantial portion was allocated to pay the costs associated with the sale of the Stella Group. See *id.* at ¶ 63a. The balance of the Stella Sale Proceeds was paid into bank accounts held in the name of OA, to be distributed in accordance with the Allocation Letter. *Id.* at ¶ 63b.

110.    OA ultimately received only $150 million in Stella Sale Proceeds following the closing of the Stella Group sale. Thus, OA received approximately 10 to 20 cents on the dollar in respect of its substantial loans to the Stella Group, while Fortress received **full** repayment of the Castle Facility out of the Stella Sale Proceeds — notwithstanding the fact that Fortress was not a creditor of the Stella Group or OA, had no interest in the Stella Group or OA and had no right to any portion of the Stella Sale Proceeds.

**Additional Fraudulent Transfers Were**
**Made to Fortress in December 2008**
**and February 2009**

111.    On or about September 15, 2008, Anderson informed the administrators of OA,

incorrectly, that OA held monies, which subsequently became the subject of the December 2008

Payment and the February 2009 Payment (each as defined below), in trust for OL.   Ex. B, at

¶ 89.  Anderson relied upon the terms of the Allocation Letter.  *Id.* at ¶ 89A.

112.    On or about December 23, 2008, the administrators of OA transferred

$19,746,713.63 of remaining Stella Sale Proceeds to the receivers and managers of OL (the

"**December 2008 Payment**").  *Id.* at ¶ 64.

113.    Following receipt of the December 2008 Payment, on or about December 23,

2008, the receivers and managers of OL transferred the same sum of $19,746,713.63 to Fortress.

*Id.* at ¶ 65.  The same sum was deposited into, and remains in, account number 082-001 17-156-

7909 styled in the name of "Fortress Credit Corporation (Australia) II Pty Limited" held by

Fortress in Australia with the National Australia Bank (the "**Escrow Account**").  *Id.* at ¶ 66.

114.    On or about February 4, 2009, the administrators of OA transferred $304,331.05

to the receivers and managers of OL (the "**February 2009 Payment**").  *Id.* at ¶ 67.  The

$304,331.05 was interest earned on the $19,746,713.63 that was the subject of the December

2008 Payment for the period from the closing of the Stella Share Sale Agreement until the

making of the February 2009 Payment.  *Id.* at ¶ 68.  Following receipt of the February 2009

Payment, the receivers and managers of OL transferred the same sum of $304,331.05 to Fortress.

*Id.* at ¶ 69.  That sum was deposited into, and remains in, the Escrow Account.  *Id.* at ¶ 70.

115.    The December 2008 Payment and the February 2009 Payment were made by the

administrators of OA in the erroneous belief and on the basis that:  OA held those monies in trust

for OL and, at the time that the Deed of Release was signed, OL had substantial loans into the Stella Group in the amounts specified in the Stella Proceeds Deed. *Id.* at ¶ 113.

**Anderson and White Breached Their Fiduciary
and Other Duties as Directors of OA**

116.    At all material times between June 2007 and February 2008, Anderson and White were directors of OA and owed to OA fiduciary duties as well as duties under sections 180, 181 and 182 of the Corporations Act. Anderson and White breached their duties as directors of OA by allowing OA's interests to be materially thwarted by the execution of the Stella Proceeds Deed, the Deed of Release and/or the Allocation Letter, and/or by authorizing the Fortress Payment and the subsequent allocation of the Stella Sale Proceeds. See *id.* at ¶¶ 82-94, 103-106.

117.    Anderson and White were in a position of conflict of duty because they acted as officers of OL, and in its interests, and were also directors of OA. *Id.*

118.    Anderson executed:

    (a)    the Stella Proceeds Deed, as a director or secretary of OL, MFSL, Stella Holdings, and OA;

    (b)    the Deed of Release, as a director of OA; and

    (c)    the Allocation Letter, as a director or secretary of each of OL, OA, Sunleisure and Stella Holdings.

*Id.* at ¶ 83.

119.    Further, White executed:

    (a)    the Stella Proceeds Deed, as a director of Castle, MFSL and OA;

    (b)    the Deed of Release, as a director of OA; and

    (c)    the Allocation Letter, as chief executive officer of OL and as a director on behalf of each of OA, Sunleisure, and Stella Holdings.

*Id.* at ¶ 84.

61844353.docx

120.    In addition, at all material times in their capacity as directors of OA, Anderson and White owed to OA not only fiduciary duties, but also:

(a)    duties under section 180(1) of the Corporations Act and at general law to exercise their powers and discharge their duties with the degree of care and diligence that a reasonable person would exercise if they were a director or officer of a corporation in OA's circumstances, and occupied the office held by, and had the same responsibilities within the corporation as, Anderson or White, respectively;

(b)    duties under section 181(1) of the Corporations Act and at general law to exercise their powers and discharge their duties in good faith and in the best interests of OA, and for a proper purpose; and

(c)    duties under section 182(1) of the Corporations Act and at general law not to improperly use their position to gain an advantage for themselves or someone else, or to cause detriment to OA.

*Id.* at ¶ 85.

121.    At all material times in their capacity as directors of OA, Anderson and White owed a duty to take into account the interests of the creditors of OA because OA was insolvent or would be rendered insolvent as a result of the Fortress Payment and the entry into the Stella Proceeds Deed, the Deed of Release and the Allocation Letter. *Id.* at ¶¶ 75, 86.

122.    At the time that Anderson and White executed the Stella Proceeds Deed, the Deed of Release and the Allocation Letter, at the time they authorized the Fortress Payment and the subsequent allocation of the Stella Sale Proceeds and at the time the December 2008 Payment and the February 2009 Payment were made, Anderson and White:

(a)    knew that the recitals in the Stella Proceeds Deed were incorrect, or were willfully blind to that fact;

(b)    knew that at the time of their executing the Deed of Release, OA was giving up, without any assurance whatsoever that OA would be paid any consideration (let alone fair consideration), the value of substantial loans to the Stella Group, or were willfully blind to that fact;

(c)    knew that OA was the only company in the Octaviar Group that had any substantial amount owing to it from the Stella Group at the time the Deed of Release and the Stella Proceeds Deed were signed, or were willfully blind to that fact;

(d)    knew that OA had a substantial amount owing to it from the Stella Group, in excess of the amounts set out in the recitals to the Stella Proceeds Deed, at the time the Deed of Release and the Stella Proceeds Deed were signed, or were willfully blind to that fact;

(e)    knew that Fortress was not a creditor of OA, and did not have any security or lien over the assets of OA;

(f)    knew that the Fortress Payment could not have been made without the release by OA of the OA Stella Loan Agreements and, yet, OA was not assured of receiving any consideration (let alone fair consideration) for such release;

(g)    knew, or should have known, that OA had its own substantial creditors whose interests required protection; and

(h)    knew that OA was insolvent or would be rendered insolvent as a result of the Fortress Payment and the entry into the Stella Proceeds Deed, the

> Deed of Release and the Allocation Letter, or were willfully blind to that fact.

See *id* at ¶ 86A.  Indeed, as directors of OA, Anderson and White had access to OA's books and records, which included information on the financial position of OA.  *Id.*  Further, Anderson was the CFO of the Octaviar Group, in which role one of his responsibilities was to oversee the financial position of the Octaviar Group.  *Id.*

123.   In each of the actions or omissions alleged at paragraphs 118 and 119 above, Anderson and White:

    (a)    did not give real and active consideration to the interests of OA;

    (b)    did not give real and active consideration to the interests of OA's creditors;

    (c)    did not obtain prior advice as to what was required of them by their duties given OA's financial position;

    (d)    preferred the interests of OL (or OL's creditors, including Fortress) and Castle (or Castle's creditors, including Fortress) over the interests of OA (or OA's creditors) in acting to:

        (i)    avoid default by Castle under the Castle Facility;

        (ii)    avoid a call by Fortress on the Castle Guarantee; and

        (iii)    delay or prevent the receivership, administration, or liquidation of OL, MFSL and Castle;

    (e)    failed to take any, or any adequate, steps to ascertain the correct inter-company loan balances between OA and the Stella Group, OL and the Stella Group, and Sunleisure and the Stella Group, prior to signing the Deed of Release and the Stella Proceeds Deed, or at all;

(f) failed to take steps to secure for OA any enforceable rights or benefits in return for the loans and liabilities released by it under the Deed of Release; and

(g) failed to take any steps, or any reasonable steps, to determine what was an equitable share of the Stella Sale Proceeds for OA, having regard to the intercompany loans that were released by OA under the Deed of Release.

*Id.* at ¶ 87.

124. In causing OA to execute any or all of the Deed of Release, the Stella Proceeds Deed, and the Allocation Letter, and by authorizing the Fortress Payment, Anderson and White:

(a) failed to exercise their powers and discharge their duties with a reasonable degree of care and diligence, in violation of section 180(1) of the Corporations Act and in breach of their fiduciary duties;

(b) did not act in good faith and in the best interests of OA, or for a proper purpose, in violation of section 181(1) of the Corporations Act and in breach of their fiduciary duties;

(c) improperly used their position as directors of OA to gain an advantage for OL, Castle and Fortress and the Defendants, in violation of section 182(1) of the Corporations Act and in breach of their fiduciary duties;

(d) improperly used their position to cause detriment to OA;

(e) did not act in the interests of OA's creditors; and

(f) accordingly, breached the duties they owed to OA and its creditors.

*Id.* at ¶ 88.

125. More particularly, Anderson and White breached their duties under the Corporations Act and their fiduciary duties by:

(i)     executing on behalf of OA the Deed of Release, by which OA forgave the repayment of the debts owed to it pursuant to the OA Stella Loan Agreements without any assurance that OA would be paid any consideration, let alone fair consideration, under circumstances where OA released between $737 million and $1.34 billion of loans and OA ultimately received only $150 million in Stella Sale Proceeds;

(ii)    executing on behalf of OA the Stella Proceeds Deed, by which OA agreed that $189,897,919 in Stella Sale Proceeds would be paid directly to Fortress upon closing of the Stella Share Sale Agreement;

(iii)   executing the Deed of Release and the Stella Proceeds Deed when they were inconsistent with each other in their treatment of the intercompany loan position of the Stella Group, including OA's intercompany loans to the Stella Group;

(iv)    executing on behalf of OA the Allocation Letter, which provided for the Fortress Payment and had the terms set forth at paragraph 103 above;

(v)     authorizing the Fortress Payment, by which $189,897,919 in Stella Sale Proceeds were diverted from OA, which was rightfully entitled to them by virtue of its substantial loans to the Stella Group and, instead, paid directly to Fortress, which had no legitimate interest in the Stella Proceeds, no loans to the Stella Group and no loans to OA; and

(vi)    failing to make any or any adequate inquiries to ascertain the true intercompany loan position among OA, OL and Sunleisure (on the one hand) and the Stella Group (on the other hand) prior to entering into the transactions referred to in (i) to (v).

*Id.*

126.    At the time of the foregoing breaches of the Corporations Act and their fiduciary duties, Anderson and White either deliberately disregarded, or made no adequate or reasonable inquiries as to:

    (a)    the amount owed to OA pursuant to the OA Stella Loan Agreements;

    (b)    whether OA had released its right to repayment under the OA Stella Loan Agreements for any valuable consideration;

    (c)    the fact that the intercompany loan position set forth in the Stella Proceeds Deed was wrong;

    (d)    the true intercompany loan position between the Stella Group and the Octaviar Group;

    (e)    the fact that Fortress was not a creditor of OA;

    (f)    the fact that the entry into the transactions involved a conflict of their duties to OA and to other companies in the Octaviar Group of which they were directors or officers, such as OL;

    (g)    whether OA would obtain any benefit from the transactions;

    (h)    the fact that OA had its own substantial creditors;

    (i)    the fact that OA was insolvent or would be rendered insolvent by the transactions; and

    (j)    whether the Stella Proceeds Deed, the Deed of Release and the Allocation Letter were in the best interests of OA or its creditors.

*Id.*

127.    In causing OA to make the December 2008 Payment and the February 2009 Payment, Anderson and White acted in further breach of their duties to OA.  See *id.* at ¶ 92.

128.    In causing OA to execute any or all of the Deed of Release, the Stella Proceeds Deed and the Allocation Letter, and/or by authorizing the Fortress Payment and the subsequent allocation of the Stella Sale Proceeds, Anderson and White violated the Corporations Act and breached fiduciary duties by:

    (a)    failing to act in the best interests of OA in that:

        (i)    OA's intercompany loans to the Stella Group were released and discharged without repayment; and

        (ii)    Anderson and White failed to take any, or any adequate, steps to determine the quantum and nature of OA's intercompany loans with the Stella Group that were released and discharged without repayment;

    (b)    using their position to gain a benefit for OL, Castle and MFSL in that the appointment of receivers over those companies by Fortress was postponed and prevented; and

    (c)    using their position to gain a benefit for Fortress in that Fortress received 100 cents on the dollar of all amounts outstanding under the Castle Facility when Fortress would have received less had it recovered solely from the borrower and guarantors of the Castle Facility upon liquidation of those entities.

*Id.* at ¶ 105.

129.    Further, in causing OA to execute any or all of the Deed of Release, the Stella Proceeds Deed and the Allocation Letter, and/or by authorizing the Fortress Payment and the subsequent allocation of the Stella Sale Proceeds, Anderson and White carried out a dishonest and fraudulent design. See *id.* at ¶ 108.

130.     Fortress and/or FIGA and the Defendants knew that Anderson and White were directors and officers of OA and other entities in the Octaviar Group.  Fortress and/or FIGA and the Defendants knew that Anderson and White were acting in breach of their fiduciary duties as directors of OA as well as in breach of sections 180, 181 and 182 of the Corporations Act.  Fortress and/or FIGA and the Defendants knowingly induced, substantially participated, and affirmatively assisted in the breaches by Anderson and White of their fiduciary and other duties to OA.  The Defendants (acting through Fortress and/or FIGA) exercised dominion and control over Anderson, White, OA and the Octaviar Group by demanding that the Stella Proceeds Deed — resulting in the diversion of the Stella Sale Proceeds to Fortress and the release of OA's intercompany loans without any assurance that OA would be paid any consideration, let alone fair consideration — be executed as a condition to the sale of the Stella Group.  See *id.* at ¶¶ 95-102, 107-112.

131.     In causing OA to enter into the Stella Proceeds Deed, Anderson and White did not exercise judgment or discretion of their own, and instead acted in accordance with directions and instructions given to them by Fortress and/or FIGA (acting through Kelleher and Kwei), who were controlled, directed and supervised by the Defendants, in order to have access to limited working capital in the short term to stave off the winding up of OL or other companies in the Octaviar group.  *Id.* at ¶ 186.  The Defendants dominated, controlled and made all major decisions for Fortress and FIGA.  Further, in their capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.

132.     The OA Board, and in particular Anderson and White, in their capacity as directors of OA, were accustomed to acting in accordance with the directions, instructions and wishes of Fortress and/or FIGA (which were dominated and controlled by the Defendants).  See *id.*

133.     The Defendants made, or participated in making, decisions affecting the business of OA, which was business as the banker or treasurer to the Octaviar Group. *Id.* at ¶ 187.

134.     Therefore, the Defendants were shadow directors or shadow officers of OA, and directors or officers within the meaning of section 9 of the Corporations Act. *Id.* at ¶ 188.

135.     At all material times in their capacity as shadow directors or officers of OA, the Defendants owed a duty to take into account the interests of the creditors of OA. *Id.* at ¶ 190.

136.     In requiring OA to execute the Stella Proceeds Deed and to make the Fortress Payment, the Defendants:

    (a)     did not act in good faith and in the best interests of OA, or for a proper purpose;

    (b)     improperly used their position as directors of OA to gain an advantage for Fortress and the Drawbridge Funds and/or OL and Castle;

    (c)     improperly used their position to cause detriment to OA;

    (d)     did not act in the interests of OA's creditors; and

    (e)     accordingly, breached the duties owed by them as set forth above.

*Id.* at ¶ 191.

**The Defendants Restructured Fortress and the Other Australian Fortress Entities to Thwart the Efforts of the Liquidators and OA's Creditors to Recover on Their Claims Against Fortress**

137.     Following the consummation of the Stella Share Sale Agreement and Fortress's receipt of the Fortress Payment, the Defendants engaged in a highly complex restructuring of Fortress and the other Australian Fortress Entities (the "**Australian Fortress Restructure**"). More specifically, the Defendants caused Fortress to engage in the Subsequent Fortress Transfers — including but not limited to assignments, dividends, capital reductions and share issuances, as discussed below — the effect of which was to render Fortress judgment proof by dissipating

Fortress's assets in order to hinder, delay and defeat claims and potential claims by the Liquidators on behalf of OA and its creditors. See Ex. B, at ¶ 147.

138.   Between December 31, 2010 and December 31, 2011, the Defendants caused Fortress to transfer assets consisting primarily of loans and Fortress's interest in credit default swaps with the Drawbridge Funds to FCCD, Nominee, FCCO and/or FCCO II (the "**Assignments**"). See *Id.* at ¶ 133. No formal independent consideration was given by FCCD, FCCO and FCCO II to the value of the assets transferred or to whether the Assignments were in the best interests of those companies. *Id.* at ¶ 134D.

139.   At the direction of the Defendants, on December 30, 2011, the directors of Fortress (including the Director Defendants) resolved:

(a)   to issue further ordinary shares in the company to its sole member, FCCA (the "**Share Issuance**");

(b)   to seek the approval of its sole member, FCCA, to reduce its capital by way of a share buy-back from FCCA (the "**Share Capital Reduction**"); and

(c)   to pay a dividend to its sole member, FCCA, on or before December 31, 2011 (the "**Dividend Payment**").

*Id.* at ¶ 135.

140.   The resolution to pay a dividend was passed in circumstances where:

(a)   Fortress had not previously paid a dividend to its parent company;

(b)   Fortress's usual practice was to return any excess funds to its parent by way of a capital reduction;

(c)   the payment of this dividend resulted in a loss to Fortress;

(d)     the payment of this dividend would have been in breach of the existing constitution of Fortress, which provided that dividends were only permitted to be paid from profits, except that the Director Defendants caused Fortress's constitution to be amended shortly before the payment; and

(e)     Fortress was not able to return any further money to its parent by share capital reduction and only had the means of doing so by paying a dividend.

*Id.* at ¶ 135A.

141.    At the time Fortress's constitution was amended and the resolution was passed for the share buy-back and declaration of the dividend, as described above, the Defendants and Fortress, FCCA (Fortress's sole member) and FIGA knew that the Liquidators might advance claims and causes of action against Fortress on behalf of OA and its creditors. *Id.* at ¶ 135B.

142.    On or around December 30, 2011, the Defendants caused Fortress to:

(a)     effectuate the Share Issuance and issue further ordinary shares to Fortress's sole member, FCCA;

(b)     effectuate the Share Capital Reduction and return capital to Fortress's sole member, FCCA; and

(c)     effectuate the Dividend Payment, by paying a dividend to Fortress's sole member, FCCA. *Id.* at ¶¶ 137-38.

143.    In or around January 2012, Fortress transferred the sum of approximately $19.6 million to bank accounts in the names of the Drawbridge Funds at the direction of the Defendants, acting through FCCA and FCC Ltd, purportedly as part of a return of capital or dividend payment (the "**Cash Transfer**"). *Id.* at ¶ 140.

144.    In undertaking the Assignments, the Share Capital Reduction, the Dividend Payment and the Cash Transfer, the Defendants and Fortress intended to defeat, delay and hinder potential claims by the Liquidators on behalf of OA and its creditors. *Id.* at ¶ 147.

145.    The Subsequent Fortress Transfers were an alienation of property by Fortress within the meaning of section 37A of the *Conveyancing Act 1919* (NSW) and section 228 of the *Property Law Act 1974* (Qld). *Id.* at ¶¶ 149-51.

146.    Further, the Defendants combined together or otherwise agreed:

(a)    to delay, hinder, or otherwise defraud Fortress's creditors, particularly OA; or

(b)    to ensure that Fortress would have available the minimum possible assets to satisfy any claim or potential claim or judgment obtained by OA and thereby to harm its lawful entitlements.

*Id.* at ¶ 156.

147.    The combination or agreement was done by means which were in contravention of section 37A of the *Conveyancing Act 1919* (NSW), and were thereby unlawful. *Id.* at ¶ 157.

148.    Further, the combination or agreement was done with the sole or predominant purpose of injuring OA by ensuring that any judgment debt that it might obtain against Fortress would remain unsatisfied, in whole or in part. *Id.* at ¶ 158.

149.    The Liquidators are prejudiced by the Subsequent Fortress Transfers. *Id.* at ¶ 153.

**The OA Liquidation Proceeding**

150.    On October 3, 2008, the directors of OA resolved to place OA into voluntary administration and to appoint John Lethbridge Greig and Nicholas Harwood as voluntary administrators.   On January 12, 2009, Messrs. Greig and Harwood were appointed as deed administrators pursuant to the OA Deed.   On July 31, 2009, the OA Deed was terminated.

Pursuant to section 446B of the Corporations Act and regulation 5.3A.07 of the Australian Corporations Regulations 2001, OA was deemed to have passed a special resolution that OA be voluntarily wound up. The Australian Court appointed Messrs. Greig and Harwood as the liquidators of OA.

151. On September 9, 2009, the Australian Court removed Messrs. Greig and Harwood and appointed the Liquidators as the liquidators of OA in replacement.

152. Since their appointment, the Liquidators have been, among other things, conducting an investigation into the events leading up to the collapse of OA and the other matters discussed herein. The Liquidators' investigation remains ongoing.

153. Between November 25 and December 6, 2010, the Liquidators served orders for the production of documents in the OA Liquidation Proceeding upon Fortress, Kelleher, Kwei and Slack. On December 15 and 16, 2010, the Liquidators conducted public examinations in the Australian Court of Kelleher, Kwei and Slack. On February 8 and 10, 2011, the Liquidators conducted further public examinations of Kelleher and Kwei.

154. From May 27 through May 30, 2012, the Liquidators conducted various public examinations, including a further examination of Kwei. On June 18, 2012, the Liquidators obtained a further order for production, requiring Fortress and FIGA to produce documents that Kwei referred to during his examination the previous month. On November 20, 2012, the Liquidators conducted a further public examination of Kwei in the Federal Court of Australia (New South Wales District). On December 6, 2012, the Liquidators conducted further public examinations of Kwei and Kelleher.

155. Discovery remains ongoing in Australia.

**The Australian Fortress Lawsuit**

156.    On April 3, 2012, the Liquidators commenced the Australian Fortress Lawsuit, which remains pending against Anderson, White and each of the Australian Fortress Entities.

157.    The claims and causes of action that are the subject of the Australian Fortress Lawsuit are set forth in detail in the Statement of Claim, dated May 13, 2013.  See Ex. B hereto.

158.    On September 18, 2012, the Australian Court granted an interim freezing order (the **"OA Freezing Order"**), preventing FCCO, FCCO II, FCCD, Nominees and FCCA from dealing with or removing certain assets from Australia.

159.    On November 9, 2012, the Australian Fortress Entities consented to the OA Freezing Order remaining in place until the claims set forth in the Australian Fortress Lawsuit were decided.

160.    In the Statement of Claim, the Liquidators assert numerous causes of action against the Australian Fortress Entities and Anderson and White, including:

  (1)  fraudulent transfers under sections 588FB, 588FC and 588FF of the Corporations Act (against Fortress);

  (2)  contraventions of sections 180, 181 and 182 of the Corporations Act and general law (against Anderson and White);

  (3)  involvement in contraventions under the Corporations Act (against Fortress and FIGA);

  (4)  breach of fiduciary duty (against Anderson and White);

  (5)  mistaken payment, unjust enrichment or restitution in respect of the December 2008 Payment and the February 2009 Payment (against Fortress);

    (6)      subsequent transactions to defeat claims of Liquidators (against FCCD,

FCCO, FCCO II and Nominee);

    (7)      conspiracy (against FCCA, FCCO, FCCD, FCCO II and Nominee); and

    (8)      shadow director or shadow officer claims (against Fortress and FIGA).

**The Liquidators Commenced Proceedings in the
U.S. to Investigate Defendants' Wrongful
Conduct and Bring Claims As Appropriate**

**A.**      **The Chapter 15 Case**

161.    On August 13, 2012, the Liquidators filed the Verified Petition Under Chapter 15

for Recognition of a Foreign Main Proceeding (the **"Verified Petition"**) with the United States

Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**), seeking

recognition of the OA Liquidation Proceeding as a foreign main proceeding under chapter 15 of

the United States Bankruptcy Code. The Liquidators commenced the chapter 15 case in order to,

*inter alia*, conduct an investigation into the Defendants' wrongful conduct with respect to OA.

162.    Defendant Drawbridge U.S. objected to recognition. Following briefing and a

hearing before the Bankruptcy Court with respect to the Verified Petition, on September 6, 2012,

the Bankruptcy Court entered an order (the **"Recognition Order"**), granting recognition of the

OA Liquidation Proceeding, over the objection of Drawbridge U.S. On September 20, 2012,

Drawbridge U.S. filed a Notice of Appeal of the Recognition Order. On February 21, 2013, the

Second Circuit agreed to hear a direct appeal from the Recognition Order and entered a stay of

the Bankruptcy Court proceedings. On December 11, 2013, the Second Circuit issued a decision

vacating the Recognition Order and remanding to the Bankruptcy Court for further proceedings.

Proceedings are currently pending before the Bankruptcy Court.

**B.**     **The Section 1782 Proceeding**

163.     At the invitation of Drawbridge U.S. in its briefing both to the Bankruptcy Court and the Second Circuit, on June 19, 2013, the Liquidators filed an application for judicial assistance pursuant to 28 U.S.C. § 1782 (**"Section 1782"**) with this Court.  The Liquidators filed their Section 1782 application in order to investigate the Defendants' wrongful conduct and to obtain discovery from the Defendants, referred to at that time as the **"Discovery Entities"**, for use in the OA Liquidation Proceeding pending before the Australian Court.

164.     On June 21, 2013, this Court (Preska, C.J.) entered an order (the **"Section 1782 Order"**) granting the Liquidators' Section 1782 application.  On June 24, 2013, the Liquidators duly served certain subpoenas (the **"Section 1782 Subpoenas"**) on Baker & McKenzie, which had agreed to accept service in its capacity as counsel for each of the Discovery Entities.  On July 19, 2013, the Discovery Entities filed a motion to vacate or stay the Section 1782 Order.  On August 27, 2013, following a hearing with respect to the stay motion, this Court (Engelmayer, J.) entered an order staying the Section 1782 Order.  By Stipulation and Order dated September 15, 2013, this Court (Engelmayer, J.) lifted the stay of the Section 1782 Order and required the parties to (a) proceed with discovery pursuant to the Section 1782 Order and the Section 1782 Subpoenas; and (b) meet and confer to discuss and attempt to reach agreement on a discovery protocol.

165.     On October 4, 2013, this Court (Forrest, J.) "so ordered" a Stipulation and Order relating to the Discovery Entities' production of documents (the **"Discovery Protocol"**).  Because of various breaches of the Discovery Protocol by the Discovery Entities, the Liquidators have had to seek the intervention of this Court (Berman, J.) on multiple occasions, requesting that this Court arrange a pre-motion conference in anticipation of the Liquidators filing a motion

for the entry of an order compelling the Discovery Entities to comply immediately with the Discovery Protocol and seeking other related relief.

166.    On December 4, 2013, this Court (Berman, J.) granted the Liquidators' request to assign a single judge to preside over the Section 1782 Proceeding on a going-forward basis; Judge Berman ordered that he would keep the Section 1782 proceeding on his docket.

167.    Discovery in the Section 1782 proceeding remains ongoing.

### FIRST CAUSE OF ACTION
**(Knowing Receipt of Property in Breach of Trust under Australian Law)**
**(Against Drawbridge U.S.)**

168.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-167 of this Complaint as if fully set forth herein.

169.    Under Australian law, a defendant is liable for its knowing receipt of property in breach of trust where:  (i) the defendant received an interest in property; (ii) the defendant knew the property belonged to a trust, or was held by a fiduciary; and (iii) the defendant knew that the property had been misapplied to it.

170.    By reason of the breaches of duty by Anderson and White and the payment of all or a substantial portion of the funds comprising the $189,897,919 Fortress Payment to Fortress, Fortress held the funds it received on constructive trust for OA.

171.    Thereafter, all or a substantial portion of the funds comprising the $189,897,919 Fortress Payment were transferred to the Drawbridge Funds in New York, either directly from Fortress or indirectly through the other Australian Fortress Entities or other affiliates of the Drawbridge Funds.

172.    Drawbridge U.S. knowingly received property of OA in breach of trust in the form of all or a substantial portion of the funds comprising the $189,897,919 Fortress Payment.

173.   By reason of the foregoing, the Liquidators are entitled to judgment against Drawbridge U.S. in an amount equal to the aggregate amount of funds that it received in respect of the Fortress Payment together with (a) pre-judgment and post-judgment interest thereon at the statutory rate and (b) Drawbridge U.S.'s profits thereon.

## SECOND CAUSE OF ACTION
### (Fraudulent Transfers Under New York Debtor and Creditor Law §§ 270 through 279)
### (Against Drawbridge U.S.)

174.   The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-173 of this Complaint as if fully set forth herein.

175.   At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against OA.

176.   Each of the following transactions was (individually, or in combination) a transaction of OA within the meaning of section 588FB of the Corporations Act, and thus the "initial" fraudulent transfer:[10]

    (a)    the entry into the Stella Proceeds Deed;

    (b)    the release of OA's intercompany loans to the Stella Group;

    (c)    the entry into the Allocation Letter;

    (d)    the making of the Fortress Payment; and/or

    (e)    the allocation of the Stella Sale Proceeds.

See Ex. B, at ¶ 71.  Transfers of funds comprising all or a substantial portion of the Fortress Payment then ensued, either directly or indirectly, to the Drawbridge Funds in New York as subsequent transferees.

177.   At the time or times that each of these transactions was entered into:

---

[10]    See composite Exhibit D hereto (relevant Australian law statutory provisions).

(a)     OA was insolvent or would be rendered insolvent because of the transaction or transactions;

(b)     OA was not a party to the Fortress Lien;

(c)     OA was not a party to the Castle Facility; and

(d)     Fortress was not a creditor of OA.

*Id.* at ¶ 72.

178.    At the time or times that each of these transactions was entered into, a reasonable person in OA's circumstances would not have entered into any of these transactions, having regard to:

(a)     the absence of any material benefit to OA in entering into the transaction;

(b)     the detriment to OA of entering into the transaction;

(c)     the detriment to the creditors of OA of entering into the transaction; and

(d)     the respective benefits to Castle, OL and Fortress of entering into the transaction.

*Id.* at ¶ 73.

179.    The Defendants (acting through Fortress and/or FIGA) caused Castle, OA, OL, MFSL, Stella Holdings and Fortress to execute the Stella Proceeds Deed as a condition to the Stella Share Sale Agreement being consummated.   Anderson and White signed the Stella Proceeds Deed on behalf of OA. See *id.* at ¶¶ 82-83.

180.    In causing OA to enter into the Stella Proceeds Deed, Anderson and White did not exercise judgment or discretion of their own, and instead acted in accordance with directions and instructions given to them by Fortress and/or FIGA (acting through Kelleher and Kwei), who were controlled, directed and supervised by the Defendants, in order to have access to limited working capital in the short term to stave off the winding up of OL or other companies in the

Octaviar Group.  *Id.* at ¶ 185.  The Defendants dominated, controlled and made all major decisions for Fortress and FIGA.  Further, in their capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.

181.    The effect of the Deed of Release, the Stella Proceeds Deed and the Allocation Letter was (a) OA's interest in and 100% entitlement to the Stella Sale Proceeds (in view of its intercompany loans) was diverted to Fortress without any assurance that OA would be paid any consideration, let alone fair consideration; and (b) OA released between $737 million and $1.34 billion of loans.

182.    Each of these transactions (individually and/or in combination) was an uncommercial transaction within the meaning of section 588FB of the Corporations Act.  *Id.* at ¶¶ 74.  Additionally, each of these transactions (individually or in combination) was an insolvent transaction within the meaning of section 588FC of the Corporations Act because each transaction was entered into at a time when OA was insolvent or would be rendered insolvent because of the entry into any one or more of the transactions.[11]  *Id.* at ¶¶ 75-76.

183.    Under sections 588FE(3) and (4) of the Corporations Act,[12] each of these transactions (individually, or in combination) is a voidable transaction.  *Id.* at ¶ 78.

184.    The same result would obtain with respect to the Deed of Release, the Stella Proceeds Deed, the Allocation Letter and the making of the Fortress Payment under New York law because each of these transactions was entered into (A) with intent to hinder, delay, or defraud the creditors of OA or (B) was made (i) at a time when OA was insolvent or would be

---

[11]     See Ex. D.

[12]     See Ex. D.

rendered insolvent as a result of these transactions, and (ii) without fair consideration being paid or transferred to OA.

185.   As a result of these transactions, the $189,897,919 Fortress Payment was transferred to Fortress.

186.   All or a substantial portion of the funds comprising the $189,897,919 Fortress Payment were subsequently transferred to the Drawbridge Funds in New York, either directly from Fortress or indirectly through the other Australian Fortress Entities or other affiliates of the Drawbridge Funds.

187.   By reason of the foregoing, the Liquidators are entitled to a judgment pursuant to sections 270 through 279 of the New York Debtor and Creditor Law, (a) avoiding any and all transfers to Drawbridge U.S. of any funds whatsoever comprising all or any portion of the $189,897,919 Fortress Payment, (b) directing that such transfers be set aside, (c) recovering from Drawbridge U.S. the funds that it received pursuant to such transfers, or the value thereof, and (d) pre-judgment and post-judgment interest at the statutory rate.

### THIRD CAUSE OF ACTION
### (Aiding and Abetting Fraudulent Transfers Under New York Law)
### (Against All Defendants)

188.   The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-187 of this Complaint as if fully set forth herein.

189.   Each of the following transactions (individually, or in combination) is a voidable transaction under sections 588FE(3) and (4) of the Corporations Act:[13]

        (a)      the entry into the Stella Proceeds Deed;

---

[13]      See Ex. D.

     (b)    the release of intercompany loans under the OA Stella Loan Agreements pursuant to the Deed of Release;

     (c)    the entry into the Allocation Letter;

     (d)    the making of the $189,897,919 Fortress Payment;

     (e)    the allocation of the Stella Sale Proceeds; and

     (f)    the making of the December 2008 Payment and the February 2009 Payment, totaling $20,051,044.68.

*Id.* at ¶¶ 71, 78.

190.　Accordingly, each of the foregoing transactions constitutes a fraudulent transfer under Australian law.

191.　Further, as alleged in paragraphs 175-186 above, the transfers of all or a substantial portion of the funds comprising the $189,897,919 Fortress Payment to the Drawbridge Funds in New York are fraudulent transfers under New York law.

192.　All of the Defendants aided and abetted in the foregoing fraudulent transfers under New York law.　The Defendants caused Fortress and FIGA to carry out a scheme to wrongfully divert $209,948,963.68 from OA to Fortress.　In addition, the Defendants caused Anderson and White (through Fortress and FIGA) to execute the Stella Proceeds Deed, the Deed of Release and the Allocation Letter, and/or authorize the Fortress Payment and the subsequent allocation of the Stella Sale Proceeds.　See *id.* at ¶ 110.

193.　All of the Defendants benefitted from the foregoing fraudulent transfers.

194.　The OA Board, and in particular Anderson and White, in their capacity as directors of OA, acted in accordance with the directions, instructions and wishes of Fortress and/or FIGA (acting through Kelleher and Kwei), who were controlled, directed and supervised by the Defendants.　See *id.* at ¶ 186.　The Defendants controlled, dominated and made all major

decisions for Fortress and FIGA.  Further, in their capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.

195.    The Defendants made, or participated in making, decisions affecting the business of OA, which was business as the banker or treasurer to the Octaviar Group.  *Id.* at ¶ 187.

196.    The Defendants drafted and/or caused Fortress and their counsel, Baker & McKenzie, to draft the Stella Proceeds Deed at a time when the Defendants had serious concerns regarding the solvency of the Octaviar Group.

197.    The Defendants caused Fortress to fraudulently transfer to the Drawbridge Funds in New York all or a substantial portion of the funds comprising the $189,897,919 Fortress Payment.  As a result of their aiding and abetting in the foregoing fraudulent transfers, the Defendants deprived OA of $209,948,963.68 in Stella Sale Proceeds — *i.e.*, the $189,897,919 Fortress Payment plus the December 2008 Payment and the February 2009 Payment.

198.    By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be proven at trial, which will be substantially in excess of $209,948,963.68, plus pre-judgment and post-judgment interest at the statutory rate.

## FOURTH CAUSE OF ACTION
### (Subsequent Transactions to Defeat Claims of Liquidators Under Australian Law)
### (Against All Defendants)

199.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-198 of this Complaint as if fully set forth herein.

200.    Under Australian law, a defendant is liable for subsequent transactions to defeat claims of creditors if:  (1) the defendant engaged in transactions that constituted an alienation of property within the meaning of section 37A of the *Conveyancing Act 1919* (NSW) and/or section

228 of the *Property Law Act 1974* (Qld);[14] (2) the transactions had the substance and effect of defrauding creditors of the entity that conveyed property to the defendants; and (3) the plaintiff suffered prejudice as a result.

201.    The Subsequent Fortress Transfers were an alienation of property by Fortress within the meaning of section 37A of the *Conveyancing Act 1919* (NSW) and section 228 of the *Property Law Act 1974* (Qld).  Ex. B, at ¶¶ 149-52.

202.    The Subsequent Fortress Transfers and the financing of those transactions together comprised an alienation of property done by a series of steps initiated by Fortress at the direction and with the approval of the Defendants, the substance and effect of which was to defraud Fortress's creditors, particularly OA. *Id.* at ¶ 152A.

203.    The Liquidators were prejudiced by the Subsequent Fortress Transfers. *Id.* at ¶ 153.

204.    Through the Subsequent Fortress Transfers, the Defendants caused Fortress to dissipate its assets through a series of transactions with affiliates in order to render Fortress judgment proof and thwart the efforts of the Liquidators and OA's creditors to recover on their claims against Fortress.

205.    Accordingly, under Australian law, the Liquidators are entitled to recover from the Defendants in an amount equal to $209,948,963.68 — *i.e.*, the $189,897,919 Fortress Payment plus the December 2008 Payment and the February 2009 Payment.

206.    By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be determined at trial, but not less than $209,948,963.68 together with pre-judgment and post-judgment interest thereon at the statutory rate.

---

[14]     See Ex. D.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty Under New York Law)**
**(Against All Defendants)**

207.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-206 of this Complaint as if fully set forth herein.

208.    In their capacity as directors of OA, Anderson and White owed fiduciary duties to OA not to:

    (a)    exercise their powers other than in a spirit of fidelity to the purpose for which those powers were given;

    (b)    exercise their powers in the interests of someone other than OA or in a way that was not in the best interests of OA as a whole;

    (c)    use their position to gain a benefit for themselves or someone else; and

    (d)    act in a position of conflict, or place themselves in a position of conflict.

*Id.* at ¶ 104.

209.    At the time the Stella Group was sold to Global Voyager in February 2008, Anderson and White also owed fiduciary duties to the creditors of OA, since OA was insolvent or would be rendered insolvent because of any one or more of:  (a) the entry into the Stella Proceeds Deed; (b) the release of OA's intercompany loans to the Stella Group; (c) the entry into the Allocation Letter; (d) the making of the Fortress Payment; and/or (e) the allocation of the Stella Sale Proceeds. *Id.* at ¶¶ 75, 86.

210.    Anderson and White breached their fiduciary duties to OA and its creditors by, *inter alia*, executing the Stella Proceeds Deed, the Deed of Release and the Allocation Letter, and/or by authorizing the Fortress Payment and allocating the Stella Sale Proceeds. *Id.* at ¶¶ 105-06.  The Stella Proceeds Deed, which the Defendants drafted and/or caused Fortress and

their counsel (Baker & McKenzie) to draft, contained blatant misrepresentations regarding the intercompany loan position of the Octaviar Group and the Stella Group. *Id.* at ¶¶ 47A, 97.

211.    The Defendants are very sophisticated parties.  They each knew that Anderson and White owed the fiduciary duties alleged herein.  Further, each of the Defendants (as well as Fortress and/or FIGA) knew that Anderson and White were acting in breach of their fiduciary duties as directors of OA as well as in breach of sections 180, 181 and 182 of the Corporations Act.[15]

212.    The OA Board, and in particular Anderson and White, in their capacity as directors of OA, acted in accordance with the directions, instructions and wishes of Fortress and/or FIGA (acting through Kelleher and Kwei), who themselves were controlled, directed and supervised by the Defendants.  See *id.* at ¶ 186.  The Defendants dominated, controlled and made all major decisions for Fortress and FIGA.  Further, in their capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.

213.    The Defendants made, or participated in making, decisions affecting the business of OA, which was business as the banker or treasurer to the Octaviar Group. *Id.* at ¶ 187.

214.    Each of the Defendants, acting through Fortress and/or FIGA, knowingly induced, rendered substantial assistance to, and participated in the foregoing breaches of fiduciary duty by Anderson and White by, among other things, causing Anderson and White (through Fortress and FIGA) to execute the Stella Proceeds Deed, the Deed of Release and the Allocation Letter, and/or to authorize the Fortress Payment and allocate the Stella Sale Proceeds.  See *id.* at ¶ 110.

215.    As a result of their aiding and abetting breaches of fiduciary duty by Anderson and White, the Defendants deprived OA of $209,948,963.68 in Stella Sale Proceeds through the

---

[15]    See Ex. D.

Fortress Payment, the December 2008 Payment, and the February 2009 Payment.   OA was insolvent or was rendered insolvent as a result of the Defendants' conduct, and subsequently became the subject of the OA Liquidation Proceeding.

216.   By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be proven at trial, which will be substantially in excess of $209,948,963.68, plus pre-judgment and post-judgment interest at the statutory rate.

**SIXTH CAUSE OF ACTION**
**(Involvement in Contraventions of OA Directors' Duties Under the Australian Corporations Act)**
**(Against All Defendants)**

217.   The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-216 of this Complaint as if fully set forth herein.

218.   Under the Corporations Act, a defendant is liable for its involvement in contraventions of directors' duties where:  (1) directors of a corporation contravened their duties under sections 181(1) and/or 182(1) of the Corporations Act; (2) the defendant knew or should have known of such contraventions of the directors' duties; and (3) the defendant (a) abetted, counseled and/or procured such contraventions of their duties within the meaning of section 79(a) of the Corporations Act;  (b) aided and abetted, counseled, procured or induced such contraventions of their duties within the meaning of section 79(b) of the Corporations Act; or (c) was knowingly concerned in, or party to, such contraventions of their duties within the meaning of section 79(c) of the Corporations Act.[16]

219.   In their capacity as directors of OA, Anderson and White owed duties under section 181(1) of the Corporations Act to exercise their powers and discharge their duties in good faith and in the best interests of OA, and for a proper purpose. *Id.* at ¶ 189.

---

[16]      See Ex. D.

220.   Furthermore, Anderson and White owed duties under section 182(1) of the Corporations Act not to improperly use their position as directors of OA to gain an advantage for themselves or someone else, or to cause detriment to OA. *Id.*

221.   Anderson and White contravened their duties under sections 181(1) and 182(1) of the Corporations Act by, *inter alia*, executing the Stella Proceeds Deed, the Deed of Release and the Allocation Letter, and/or by authorizing the Fortress Payment and the subsequent allocation of the Stella Sale Proceeds. *Id.* at ¶ 191.

222.   Each of the Defendants knew or should have known that Anderson and White contravened their duties under the Corporations Act alleged herein. *Id.* at ¶ 99.

223.   The Defendants (acting through Fortress and/or FIGA) abetted, counseled and/or procured Anderson and White's contraventions of their duties within the meaning of section 79(a) of the Corporations Act. *Id.* at ¶ 98.

224.   The Defendants (acting through Fortress and/or FIGA) aided and abetted, counseled, procured or induced Anderson and White's contraventions of their duties within the meaning of section 79(b) of the Corporations Act. *Id.*

225.   The Defendants (acting through Fortress and/or FIGA) were knowingly concerned in, or party to, Anderson and White's contraventions of their duties within the meaning of section 79(c) of the Corporations Act. *Id.*

226.   The OA Board, and in particular Anderson and White, in their capacity as directors of OA, were accustomed to acting in accordance with the directions, instructions and wishes of Fortress and/or FIGA (acting through Kelleher and Kwei), who themselves were controlled, directed and supervised by the Defendants. See *id.* at ¶ 186. The Defendants dominated, controlled and made all major decisions for Fortress and FIGA. Further, in their

capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.

227.    The Defendants made, or participated in making, decisions affecting the business of OA, which was business as the banker or treasurer to the Octaviar Group. *Id.* at ¶ 187.

228.    The Defendants knew of all of the breaches of duty under sections 181(2) and/or 182(2) of the Corporations Act.

229.    As a result of their involvement in the foregoing contraventions of Anderson and White's duties, the Defendants deprived OA of $209,948,963.68 in Stella Sale Proceeds through the Fortress Payment, the December 2008 Payment, and the February 2009 Payment.

230.    By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be determined at trial, but not less than $209,948,963.68 together with (a) pre-judgment and post-judgment interest thereon at the statutory rate and (b) pursuant to section 1317H of the Corporations Act,[17] the Defendants' profits thereon.

## SEVENTH CAUSE OF ACTION
### (Knowing Assistance in Breach of Fiduciary Duty Under Australian Law)
### (Against All Defendants)

231.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-230 of this Complaint as if fully set forth herein.

232.    Under Australian law, a defendant is liable for providing knowing assistance in a breach of fiduciary duty where:  (1) a fiduciary committed a breach of his or her fiduciary duty and/or carried out a dishonest and fraudulent design; and (2) the defendant knowingly assisted in such breach of fiduciary duty and/or dishonest and fraudulent design.

---

[17]      See Ex. D.

233.    Anderson and White failed to act in the best interests of OA by causing OA to execute the Stella Proceeds Deed, the Deed of Release and/or the Allocation Letter, and/or by authorizing the Fortress Payment and the subsequent allocation of the Stella Sale Proceeds. *Id.* at ¶ 105.  In addition, Anderson and White were wearing several hats and were conflicted, and they used their position to gain a benefit for the Defendants because the Castle Facility was repaid improperly out of the Stella Sale Proceeds. *Id.*

234.    Through their actions, Anderson and White carried out a dishonest and fraudulent design. *Id.* at ¶ 108.

235.    The Defendants knew or should have known of Anderson and White's breach of fiduciary duties and/or their dishonest or fraudulent design. *Id.* at ¶ 109.

236.    The Defendants (acting through Fortress and/or FIGA) knowingly assisted in Anderson and White's breach of fiduciary duties and/or their dishonest or fraudulent design.  See *id.* at ¶ 110.

237.    Accordingly, the Defendants are liable for knowing assistance in breaches of fiduciary duty under Australian law, under the second limb of *Barnes v Addy* (1874) LR 9 Ch App 244. *Id.* at ¶ 111.

238.    By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be determined at trial, but not less than $209,948,963.68 together with (a) pre-judgment and post-judgment interest thereon at the statutory rate and (b) the Defendants' profits thereon.

### EIGHTH CAUSE OF ACTION
### (Unjust Enrichment Under New York Law)
### (Against Drawbridge U.S.)

239.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-238 of this Complaint as if fully set forth herein.

70

240.    All or a substantial portion of the funds comprising the $189,897,919 Fortress Payment were transferred to the Drawbridge Funds in New York, either directly from Fortress or indirectly through the other Australian Fortress Entities or other affiliates of the Drawbridge Funds.  As a result, Drawbridge U.S. was unjustly enriched at the expense of OA.

241.    Through its wrongful and inequitable conduct, Drawbridge U.S. derived a benefit by obtaining property of OA in the form of all or a substantial portion of the $189,897,919 in funds comprising the Fortress Payment.  Equity and good conscience require full restitution of the monies received by Drawbridge U.S.

242.    By reason of the foregoing, the Liquidators are entitled to judgment against Drawbridge U.S. in amount equal to the aggregate amount of funds that it received in respect of the Fortress Payment together with pre-judgment and post-judgment interest thereon at the statutory rate.

**NINTH CAUSE OF ACTION**
**(Conspiracy Under Australian Law)**
**(Against All Defendants)**

243.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-242 of this Complaint as if fully set forth herein.

244.    Under Australian law, two or more defendants are liable for the tort of conspiracy when:  (1) the defendants engaged in a combination to do unlawful acts necessarily involving injury; or (2) the defendants agreed to effect an unlawful purpose, whether as an end, or a means to an end, and in the carrying out of that agreement damage is caused to another.

245.    Following the consummation of the Stella Share Sale Agreement and Fortress's receipt of the Fortress Payment, the Defendants engaged in the complex Australian Fortress Restructure.  At all relevant times, the Defendants were aware of the possibility that the Liquidators would assert claims against Fortress.  See Ex. B, at ¶ 135B.

246.    The Defendants acting together with Fortress and/or FIGA agreed to delay, hinder or otherwise defraud creditors of Fortress, particularly OA, ensuring that Fortress would have available the minimum possible assets to satisfy any claim or potential claim or judgment obtained by OA and thereby to harm OA's lawful entitlements. *Id.* at ¶ 156.

247.    The foregoing combination or agreement was done by means which were in contravention of section 37A of the *Conveyancing Act 1919* (NSW), and the combination or agreement was therefore unlawful. *Id.* at ¶ 157.[18]

248.    Further, the foregoing combination or agreement was done with the sole or predominant purpose of injuring OA by ensuring that any judgment that it might obtain against Fortress would remain unsatisfied, in whole or in part. *Id.* at ¶ 158.

249.    As a result of their involvement in the contraventions of Anderson and White's duties, as set forth above, the Defendants deprived OA of $209,948,963.68 in Stella Sale Proceeds through the Fortress Payment, the December 2008 Payment and the February 2009 Payment. All or a substantial portion of the funds comprising the $189,897,919 Fortress Payment were transferred to the Drawbridge Funds in New York, either directly from Fortress or indirectly through the other Australian Fortress Entities or other affiliates of the Drawbridge Funds. In addition, the Defendants caused Fortress to dissipate its assets through the Subsequent Fortress Transfers in order to render Fortress judgment proof and thwart the efforts of the Liquidators and OA's creditors to recover on their claims against Fortress.

250.    By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be determined at trial, but not less than $209,948,963.68 together with pre-judgment and post-judgment interest thereon at the statutory rate.

---

[18]    See Ex. D.

**TENTH CAUSE OF ACTION**
**(Shadow Director or Officer Claim Under Australian Law)**
**(Against All Defendants)**

251.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-250 of this Complaint as if fully set forth herein.

252.    Under Australian law, a defendant is liable for a shadow director or shadow officer claim when:  (1) the defendant was not a validly appointed director or officer of a company, (2) the company's directors were accustomed to act in accordance with the defendant's instructions or wishes and (3) the defendant breached the duties of a director or officer of the company.

253.    In February 2008, the OA Board acted in accordance with the directions, instructions and wishes of Fortress and/or FIGA (acting through Kelleher and Kwei), who themselves were controlled, directed and supervised by the Defendants, in causing OA to pay only those debts approved by the Defendants.  *Id.* at ¶ 186.  The Defendants dominated, controlled and made all major decisions for Fortress and FIGA.  Further, in their capacity as directors of Fortress and FIGA, the Director Defendants dominated, controlled and supervised both of those entities.

254.    The purpose of the Defendants' conduct was to prevent the Octaviar Group from being wound up in an insolvency proceeding until Fortress had received the Fortress Payment, and otherwise not funding the Octaviar Group with any long- or medium-term objective of achieving or maintaining the Octaviar Group's solvency.

255.    The Defendants, acting through Fortress and/or FIGA, caused Anderson and White to enter into the Stella Proceeds Deed — which the Defendants drafted and/or caused Fortress and their counsel (Baker & McKenzie) to draft — as a condition to the Defendants

(acting through Fortress and/or FIGA) consenting to the consummation of the Stella Share Sale Agreement. *Id.* at ¶ 182.

256.     The Stella Proceeds Deed was detrimental to OA and it was not in OA's interests to enter into it. *Id.* at ¶ 184.

257.     In causing OA to enter into the Stella Proceeds Deed, Anderson and White did not exercise judgment or discretion of their own, and instead acted in accordance with directions and instructions given to them by Fortress and/or FIGA (which were controlled and dominated by the Defendants) in order to have access to limited working capital in the short term to stave off the winding up of OL or other companies in the Octaviar group. *Id.* at ¶ 185.

258.     The OA Board, and in particular Anderson and White, in their capacity as directors of OA, were accustomed to acting in accordance with the directions, instructions and wishes of Fortress and/or FIGA (which were controlled and dominated by the Defendants).  See *id.* at ¶ 186.

259.     Further, the Defendants made, or participated in making, decisions affecting the business of OA, which was business as the banker or treasurer to the Octaviar Group.  *Id.* at ¶ 187.

260.     Therefore, the Defendants were shadow directors or shadow officers of OA, and directors or officers within the meaning of section 9 of the Corporations Act.[19]  See *id.* at ¶ 188.

261.     As directors or officers of OA, the Defendants owed to OA:

(a)     duties under section 180(1) of the Corporations Act and at general law to exercise their powers and discharge their duties with the degree of care and diligence that a reasonable person would exercise if they were a

---

[19]     See Ex. D.

director or officer of a corporation in the corporation's circumstances, and occupied the office held by, and had the same responsibilities within the corporation as, the Defendants;

(b)    duties under section 181(1) of the Corporations Act and at general law to exercise their powers and discharge their duties in good faith and in the best interests of OA, and for a proper purpose; and

(c)    duties under section 182(1) of the Corporations Act and at general law not to improperly use their position to gain an advantage for themselves or someone else, or to cause detriment to OA.[20]

See *id.* at ¶ 189.

262.    At all material times in their capacity as shadow directors or officers of OA, the Defendants owed a duty to take into account the interests of the creditors of OA, given that OA was insolvent or about to become insolvent. See *id.* at ¶¶ 75, 190.

263.    In requiring OA to execute the Stella Proceeds Deed, the Deed of Release and/or the Allocation Letter, and/or by directing that the Fortress Payment be made, the Defendants:

(a)    did not act in good faith and in the best interests of OA, or for a proper purpose;

(b)    improperly used their position as directors of OA to gain an advantage for Fortress, and/or OL and Castle;

(c)    improperly used their position to cause detriment to OA;

(d)    did not act in the interests of OA's creditors; and

(e)    accordingly, breached their duties owed to OA and its creditors.

---

[20]    See Ex. D.

See *id.* at ¶ 191.

264.   As a result of their involvement in the foregoing contraventions of Anderson and White's duties, the Defendants deprived OA of $209,948,963.68 in Stella Sale Proceeds through the Fortress Payment, the December 2008 Payment, and the February 2009 Payment.

265.   By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be determined at trial, but not less than $209,948,963.68 together with (a) pre-judgment and post-judgment interest thereon at the statutory rate and (b) pursuant to section 1317H of the Corporations Act,[21] the Defendants' profits thereon.

### ELEVENTH CAUSE OF ACTION
### (Conversion Under New York Law)
### (Against Drawbridge U.S.)

266.   The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-265 of this Complaint as if fully set forth herein.

267.   The Defendants (acting through Fortress and/or FIGA) caused Anderson and White to execute the Stella Proceeds Deed, the Deed of Release and/or the Allocation Letter, and/or to authorize the Fortress Payment and allocate the Stella Sale Proceeds.

268.   As a result, Fortress and Drawbridge U.S. deprived OA of and converted Stella Sale Proceeds to which OA is entitled.

269.   All or a substantial portion of the funds comprising the $189,897,919 Fortress Payment were transferred to the Drawbridge Funds in New York, either directly from Fortress or indirectly through the other Australian Fortress Entities or other affiliates of the Drawbridge Funds.

---

[21]     See Ex. D.

270. Thus, Drawbridge U.S. engaged in the unauthorized assumption and exercise of the right of ownership over funds belonging to OA to the exclusion of the OA's rights.

271. By reason of the foregoing, the Liquidators are entitled to judgment against Drawbridge U.S. in amount equal to the aggregate amount of funds that it received in respect of the Fortress Payment together with pre-judgment and post-judgment interest thereon at the statutory rate.

### TWELFTH CAUSE OF ACTION
### (Aiding and Abetting Fortress's Conversion Under New York Law)
### (Against all Defendants)

272. The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-271 of this Complaint as if fully set forth herein.

273. Through the Fortress Payment, the December 2008 Payment, and the February 2009 Payment, Fortress assumed and exercised ownership over $209,948,963.68 in funds belonging to OA to the exclusion of OA's rights. Thus, Fortress converted property of OA, as set forth in paragraphs 267-268 above.

274. The foregoing transfers of funds were made at the direction of the Defendants.

275. The Defendants had knowledge of Fortress's conversion of funds belonging to OA through the Fortress Payment.

276. All of the Defendants provided substantial assistance in Fortress's receipt of the Fortress Payment. Accordingly, the Defendants aided and abetted in the conversion by Fortress. Consequently, the Defendants caused OA to suffer damages in excess of $209,948,963.68.

277. By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be proven at trial, which will be substantially in excess of $209,948,963.68, plus pre-judgment and post-judgment interest at the statutory rate.

## THIRTEENTH CAUSE OF ACTION
### (Aiding and Abetting Drawbridge U.S.'s Conversion Under New York Law)
### (Against FIG LLC and the Director Defendants)

278.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-277 of this Complaint as if fully set forth herein.

279.    Through the transfers of funds comprising the Fortress Payment (in whole or in part) to Drawbridge U.S., Drawbridge U.S. converted property of OA, as set forth in paragraphs 267-270 above.

280.    The foregoing transfers of funds to Drawbridge U.S. were made at the direction of FIG LLC and the Director Defendants.

281.    FIG LLC and the Director Defendants had knowledge of Drawbridge U.S.'s conversion of funds belonging to OA.

282.    FIG LLC and the Director Defendants provided substantial assistance in Drawbridge U.S.'s receipt of funds comprising  (in whole or in part) the Fortress Payment. Accordingly, FIG LLC and the Director Defendants aided and abetted in the conversion by Drawbridge U.S.  Consequently, Defendants caused OA to suffer damages in excess of $209,948,963.68.

283.    By reason of the foregoing, the Liquidators are entitled to judgment against FIG LLC and the Director Defendants in amount equal to the aggregate amount of funds that it received in respect of the Fortress Payment together with pre-judgment and post-judgment interest thereon at the statutory rate.

## FOURTEENTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations Under New York Law)
### (Against all Defendants)

284.    The Liquidators repeat and reallege each and every allegation contained in paragraphs 1-283 of this Complaint as if fully set forth herein.

285.    OA is a party to the OA Stella Loan Agreements, which are valid and enforceable contracts. See Ex. B, at ¶ 20.

286.    The Defendants had knowledge of the OA Stella Loan Agreements and the substantial loans that OA made to the Stella Group thereunder. See *id.* at ¶ 46B.

287.    The Defendants (acting through Fortress and/or FIGA) caused SGH, Stella MLR and LRH to breach their obligations under the OA Stella Loan Agreements by failing to repay the OA Stella Loan Agreements in full to OA.

288.    The Defendants (acting through Fortress and/or FIGA) intentionally and improperly interfered with the OA Stella Loan Agreements by causing Anderson and White to execute the Stella Proceeds Deed, the Deed of Release or the Allocation Letter, and/or by authorizing the Fortress Payment and allocating the Stella Sale Proceeds, which caused and resulted in SGH, Stella MLR and LRH breaching their respective obligations under the OA Stella Loan Agreements.   The Defendants intentionally procured the foregoing breaches of contract by SGH, Stella MLR and LRH without justification.

289.    The Defendants' interference, through Fortress and FIGA, with the contractual relations of OA deprived OA of $209,948,963.68 in funds to which it is entitled.   Consequently, the Defendants caused OA to suffer damages in excess of $209,948,963.68.

290.    By reason of the foregoing, the Liquidators are entitled to judgment in an amount to be proven at trial, which will be substantially in excess of $209,948,963.68, plus pre-judgment and post-judgment interest at the statutory rate.

WHEREFORE, the Liquidators pray that this Court enter judgment against the Defendants as follows:

(1)     damages in an amount to be proven at trial, which will be substantially in excess of $209,948,963.68;

(2)     pre-judgment and post-judgment interest at the statutory rate;[22]

(3)     pursuant to section 1317H of the Corporations Act and in respect of the Sixth and Tenth Causes of Action, the Defendants' profits thereon;

(4)     the Liquidators' costs, expenses and reasonable attorneys' fees; and

(5)     such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        February 27, 2014

                          KAYE SCHOLER LLP
                          By: *Madlyn Gleich Primoff*
                          Madlyn Gleich Primoff, Esq.
                          Angela R. Vicari, Esq.
                          Joseph Otchin, Esq.
                          425 Park Avenue
                          New York, N.Y. 10022
                          (212) 836-8000
                          mprimoff@kayescholer.com

                          *Attorneys for Katherine Elizabeth Barnet*
                          *and William John Fletcher, as*
                          *liquidators of Octaviar Administration*
                          *Pty Ltd (in liquidation)*

---

[22]     With respect to the causes of action under Australian law, the total damages including interest are currently $335 million and interest continues to accrue thereon.