UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
KATHERINE ELIZABETH BARNET AND
WILLIAM JOHN FLETCHER, AS
LIQUIDATORS OF OCTAVIAR
ADMINISTRATION PTY LTD (IN
LIQUIDATION),

                    Plaintiffs,

      -against-

DRAWBRIDGE SPECIAL OPPORTUNITIES
FUND LP, FORTRESS INVESTMENT GROUP
LLC, GLENN PATRICK CUMMINS,
CONSTANTINE MICHAEL DAKOLIAS, AND
MARC KEITH FURSTEIN,

                  Defendants.
----------------------------------------------------------x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-5-14
```

14-cv-1376 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

        Plaintiffs bring claims arising out of the 2008 insolvency of the Octaviar Group,

affiliated Australian corporations that had engaged primarily in financial services businesses.

Plaintiffs, the court-appointed liquidators in the Australian insolvency proceeding of a primary

company in the Octaviar Group, bring this action against the United States affiliates of Fortress,

a global investment fund, and three of Fortress's U.S. directors.  Plaintiffs seek to recover

approximately $210,000,000 transferred to the defendants' Australian affiliates in 2008 and early

2009 for the benefit of creditors of the estate.[1]  Defendants have moved to dismiss plaintiffs'

complaint under Rule 12(b)(6) and on the ground of international comity.  For the reasons that

follow, the motion is granted in part and denied in part.  Counts II, III, XI, XII, and XIII are

---

[1] Unless otherwise noted, all dollar amounts in this Memorandum and Order are denominated in Australian dollars (AUD).

dismissed for failure to state a claim upon which relief may be granted, while the motion to dismiss is denied as to all other counts.

## BACKGROUND

A.  The Parties

Plaintiffs Katherine Elizabeth Barnet and William John Fletcher (together, the "Liquidators") are the court-appointed liquidators of Octaviar Administration Pty Ltd. ("OA"), a company incorporated in Queensland, Australia.  OA is part of a group of companies called the "Octaviar Group" and functioned as the treasury company for the group.  (Compl. ¶ 38, Dkt. No. 2)  Octaviar Limited ("OL"), also in liquidation in a separate Australian proceeding, is the ultimate holding company of the Octaviar Group and was primarily responsible for managing the affairs of all the companies within the Octaviar Group.  (Id. ¶ 37)  Prior to its insolvency, the Octaviar Group consisted of four discrete business units including three financial services businesses and a travel and tourism business.  (Id. ¶ 35)  The Octaviar Group operated its travel and tourism business through a collection of subsidiaries, collectively known as the "Stella Group."  (Id. ¶ 36)

Defendant Fortress Investment Group LLC ("Fortress") is a limited liability company organized under the laws of Delaware with its principal place of business in New York. (Compl. ¶ 22)  Fortress operates as a global investment management firm that raises, invests, and manages private equity funds and hedge funds.  (Id. ¶ 23)  Defendant Drawbridge Special Opportunities Fund LP ("Drawbridge") is a limited partnership organized under the laws of Delaware with its principal place of business in New York.  (Id. ¶ 19)  Drawbridge is a parent company of Fortress and also conducts business as a global hedge fund.  (Id. ¶¶ 20-21)

Defendants Glenn Patrick Cummins, Constantine Michael Dakolias, and Marc Keith Furstein (collectively, the "Director Defendants," and together with Fortress and Drawbridge, the "U.S. Defendants") are each directors of Fortress and citizens of New York.  (Id. ¶¶ 24-26)[2]

Plaintiffs allege that each of the defendants directed and controlled the activities of Fortress's Australian affiliates, including Fortress Credit Corporation (Australia) II Pty Limited ("FCCA2") and FCCA2's manager, Fortress Investment Group (Australia) Pty Limited ("FIGA"), and that the defendants transacted business with the Octaviar Group through FCAA2 and FIGA.[3]  (Id. ¶¶ 41-42)  The complaint cites the testimony of David Kelleher, a director of FCCA2 and FIGA, and Mark Kwei, an officer of FCCA2 and an employee of FIGA, to allege that all major decisions made by the Australian Fortress Entities are approved by Fortress in New York, id. ¶ 41, and that the Director Defendants are involved in decisions made on behalf of FCCA2, id. ¶ 42.  Such decisions include "all major decisions concerning [FCCA2] and/or FIGA's dealings with the Octaviar Group."  (Id. ¶ 27)  Each of the Australian Fortress Entities is named as a defendant in a consolidated action brought by the Liquidators on behalf of both OA and OL, which is currently pending before the Supreme Court of Queensland, Australia (the "Australian Action").  (Id. ¶ 156)  The conduct of Kelleher and Kwei is at issue in the Australian Action, though they are not individually named as defendants.

Aside from the Australian Fortress Entities, also named as defendants in the Australian Action are David Mark Anderson and Craig Robert White, two former directors of OA.  (Id.)  As its directors, Anderson and White owed fiduciary duties to OA under the sections

---

[2] This court has jurisdiction over the subject matter of this action. 28 U.S.C. § 1332(a)(2).
[3] Several other Australian Fortress affiliates are implicated in the Liquidators' claims, including Fortress Credit Corp (Australia) Pty Ltd ("FCCA"), FCCD (Australia) Pty Ltd ("FCCD"), FCCO (Australia) Pty Ltd ("FCCO"), FCCD (Australia) Nominee Pty Ltd ("FCCDN"), and FCCO Australia II Pty Ltd ("FCCO2") (together with FCCA2 and FIGA, the "Australian Fortress Entities," and, together with FCCA2, FIGA, Fortress, and Drawbridge, the "Fortress Entities").  (Compl. ¶ 9 n.2)

180, 181, and 182 of the Australian Corporations Act of 2001 (the "Corporations Act") and under Australian common law.  (Compl. ¶ 120; ¶ 208 (citing Australian Action complaint, Compl. Ex. A ¶ 85))  Specifically, the complaint alleges that Anderson and White were required under Australian law not to:

> (a) exercise their powers other than in a spirit of fidelity to the purpose for which those powers were given;
> (b) exercise their powers in the interests of someone other than OA or in a way that was not in the best interests of OA as a whole;
> (c) use their position to gain a benefit for themselves or someone else; and
> (d) act in a position of conflict, or place themselves in a position of conflict.

(Id. at ¶ 208)  Further, the complaint alleges that at the time of these directors' breach, OA was insolvent or would have been rendered insolvent as a result of the transfers at issue.  (Id. ¶ 209)  For Anderson and White, this circumstance triggered an additional fiduciary duty owed to OA's creditors such that the directors were required to take account of the creditors' interests.  (Id. ¶¶ 121, 209; Compl. Ex. A ¶ 86)  The complaint alleges that Anderson and White breached their fiduciary duties to OA and its creditors through a course of conduct primarily concerning the sale of the Stella Group in February 2008.  (Id. ¶¶ 122-129)

　　　　　The complaint in the Australian Action seeks to set aside three payments made to FCCA2 in 2008 and early 2009 totaling approximately $210 million and to recover the same amount for the benefit of OA's creditors, on two primary grounds: (1) that the payments constituted an "uncommercial transaction" under Australian law,[4] and (2) that in allowing OA to make the payment, Anderson and White breached their fiduciary duties to OA, and the Australian Fortress Entities were knowingly involved in and/or assisted in those breaches.

---

[4] According to the Liquidators, an "uncommercial transaction" under Australian law is analogous to a fraudulent transfer under United States law.  See Compl. ¶ 176; Atkins Decl. ¶ 41 (citing Corporations Act § 588FB, Atkins Decl. Ex. H).

Atkins Decl. ¶ 41.  The present action "arises out of the same underlying facts and circumstances as the [Australian Action] . . . ."  Compl. ¶ 11.


     B.  <u>The Castle Facility and Subsequent Amendments</u>

             On June 1, 2007, FCCA2 loaned $250,000,000 (the "Castle Facility") to Octaviar Castle Pty Ltd. ("Castle"), one of the members of Octaviar Group.  (Compl. ¶ 48)  The Castle Facility had an original maturity date of September 1, 2007.  (<u>Id.</u>)  OL and MFS Financial Services Pty Limited ("MFSL"), another member of the Octaviar Group, guaranteed the obligations of Castle under the Castle Facility.  (<u>Id.</u>)  In connection with the Castle Facility, FCCA2 obtained a lien over the assets of OL, MFSL, and Castle.  (<u>Id.</u> ¶ 50)  Significantly, OA was not a party to or a guarantor under the Castle Facility.  (<u>Id.</u> ¶ 51)

             The Castle Facility also provided FCCA2 with the right to receive detailed monthly financial information regarding the operations of OL and other companies in the Octaviar Group.   (<u>Id.</u> ¶ 50).  Specifically, FCCA2 and FIGA received periodic written reports regarding the Octaviar Group's financial condition, and OA directors Anderson and White communicated frequently with Kelleher and Kwei, a director and officer/employee, respectively, of FCCA2 and FIGA.  (<u>Id.</u>)  Kelleher and Kwei would in turn provide information received to the U.S. Defendants during weekly telephone conferences and through other communications. (<u>Id.</u> ¶ 5)

             By mid-August, 2007, Fortress became aware that the Octaviar Group's liquidity had deteriorated such that timely repayment of the Castle Facility was unlikely.  On August 16, 2007, Kelleher sent an email to defendant Dakolias noting that the Octaviar Group's "[c]urrent cash position is $20MM."  (Compl. ¶ 65 (citing Barnet Aff. ¶ 54, Dkt. No. 2))  On the following

day, FCCA2, Castle, OL, and MFSL entered into a Deed of Amendment to the Castle Facility
(the "First Deed of Amendment").  (Id. ¶ 66)  The First Deed of Amendment extended the
maturity date of the Castle Facility to December 1, 2007; in exchange, OL agreed to deliver
further detailed financial information relating to the entities in the Stella Group, including profit
and loss statements, balance sheets, and cash flow statements.  (Id. ¶ 66)  The First Deed of
Amendment further provided that it would be an event of default for the Castle Facility if OL's
five-day weighted average share price fell below $3.20.  (Id.)

On November 30, 2007, FCCA2, Castle, OL, and MFSL entered into a second
Deed of Amendment to the Castle Facility (the "Second Deed of Amendment"), extending the
maturity date of the Castle Facility to February 29, 2008.  (Id. ¶ 68)  In exchange, OL agreed to
immediately repay $100 million of the $250 million outstanding on the Castle Facility, and also
to pay fees relating to the extension of the Castle Facility, including an upfront extension fee of
$3 million.  (Id.)


C.  The Stella Group Spinoff and the Repayment of the Castle Facility

On June 28, 2007, the Octaviar Group effected a complex restructuring of the
Stella Group (the "Stella Restructure").  (Compl. ¶¶ 53-64)  The intended ultimate effect of the
Stella Restructure was to establish the Stella Group as an independent, stand-alone unit within
the Octaviar Group in order to facilitate a sale of the Stella Group to a third party purchaser.
(Id.)  This was accomplished in part by consolidating all of the Stella Group's intercompany
loans with other members of the Octaviar Group such that OA became the Stella Group's only
intercompany creditor.  (Id.)  Upon completion of the restructuring, OA was the only company

within the Octaviar Group that had any substantial intercompany loans to the Stella Group, with

a total outstanding loan amount of between $737 million and $1.34 billion.  (Id. ¶ 59)

On January 18, 2008, the Octaviar Group announced its intention to spin off its

travel and tourism business from its financial services businesses.  (Id. ¶ 70)  Immediately

following that announcement, Octaviar's share price sharply declined from an opening price of

$3.18 to a closing price of $0.99.  (Id.)  This decline in price triggered an event of default under

the amended Castle Facility, which had an outstanding balance of $150,000,000 on that date.

(Id. ¶ 72)

On February 3, 2008, the Octaviar Group reached an agreement (the "Stella Sale

Agreement") with Global Voyager Pty Limited ("Global") pursuant to which the Octaviar Group

would sell 65 percent of its 100 percent ownership interest in Stella Group to Global (the "Stella

Sale") in exchange for $400,000,000 (the "Stella Sale Proceeds").  (Id. ¶ 78)  The Stella Sale

Agreement also required that (1) all intercompany loans to companies in the Stella Group from

any company in the Octaviar Group be extinguished or cancelled, and (2) OA and other

companies involved in the Stella Sale Agreement enter into a Deed of Release effecting a release

of all intercompany loans from the Octaviar Group to the Stella Group, including outstanding

intercompany loans from OA to the Stella Group in an amount between $737 million and $1.34

billion.  (Id.)

On February 18, 2008, FCCA2, Castle, MFSL, and OL entered into a third Deed

of Amendment to the Castle Facility (the "Third Deed of Amendment").  (Id. ¶ 80)  The Third

Deed of Amendment provided, inter alia, that (1) the maturity date of the Castle Facility was

extended to the earlier of March 31, 2008 and the closing of the Stella Sale Agreement, (2) the

principal amount of the Castle Facility was increased from $150 million to $200 million, and (3)

OL was required to ensure that no members of the Octaviar Group, including OA, forgave any intercompany loans without the consent of FCCA2.  (Id.)  Because the Stella Sale Agreement required the OA intercompany loans to the Stella Group to be extinguished as a condition to closing, the Third Deed of Amendment effectively gave the Fortress Entities the right to block the sale of the Stella Group.  (Id. ¶ 81)

    On February 27, 2008, Octaviar Group sent FCCA2 a draft deed (the "Deed of Release"), which provided for the release of OA's intercompany loans to the Stella Group, in connection with the anticipated closing of the sale of the Stella Group.  (Id. ¶ 89)  The Deed of Release recited the Stella Group's intercompany loan position consistently with the alleged company structure following the Stella Restructure: that is, it listed OA as the Stella Group's sole intercompany creditor and listed no intercompany loans from OL.  (Id.)  After receiving the draft Deed of Release, the defendants caused FCCA2 and FIGA to demand the execution of a separate deed (the "Repayment Deed") providing for the full repayment of the Castle Facility out of the proceeds of the sale of the Stella Group.  (Id. ¶ 90)  The Repayment Deed provided that on the closing date of the Stella Sale Agreement, Global would pay the outstanding amount owed under the Castle Facility directly to FCCA2.  (Id. ¶ 94)  Absent the execution of the Repayment Deed, the Fortress Entities would exercise the effective veto power obtained under the Third Deed of Amendment: that is, they would not consent to the execution of the Deed of Release, thereby preventing the sale of the Stella Group from closing.  (Id. ¶ 90)

    The defendants drafted and/or caused FCCA2 and its counsel to draft the Repayment Deed.  (Id. ¶ 91)  The terms of the Repayment Deed describing the intercompany loan position between the Stella Group and the Octaviar Group differed substantially from the terms of the Deed of Release.  (Id.)  In contrast to the Deed of Release, which stated that OA was

- 8 -

the Stella Group's only intercompany creditor, the Repayment Deed stated that OL and

Sunleisure Group Pty Ltd ("Sunleisure"), another entity in the Octaviar Group, were

intercompany creditors of MFS Leisure Resort Holdings Pty Ltd ("LRH") and Stella Travel

Services Pty Limited ("STS"), two entities within the Stella Group.  (Id.)  Specifically, the

Repayment Deed stated:

> (H) LRH is a subsidiary of Stella Holdings and owes $818,620,211.13 to [OL] by
> way of intercompany loan.
>
> (I) LRH owes $517,604,366.50 to OA by way of inter-company loan.
>
> (J) STS owes $18,684.052.45 to OA by way of inter-company loan.
>
> (K) LRH owes $43,309,973.00 to Sunleisure by way of inter-company loan.

(Id.)  In short, the Liquidators allege that the Deed of Release accurately stated the Stella

Group's intercompany loan position following the Stella Restructure, and that the recitals in the

Repayment Deed were "blatantly incorrect" and substantially misstated the Stella Group's

intercompany loan position.  They further allege that the defendants knew that these recitals were

both inconsistent with the Deed of Release and wrong.  (Id. ¶ 95)

Both the Deed of Release and the Repayment Deed were executed on February

29, 2008.  (Id. ¶ 102)  On the same day, by letter from Stella Holdings to the directors of OA,

OL, and Sunleisure (the "Allocation Letter"), Stella Holdings, OA, OL, and Sunleisure agreed to

terms regarding the distribution of the Stella Sale Proceeds.  (Id. ¶ 103)  The Allocation Letter

provided, inter alia, confirmed that approximately $200 million of the Stella Sale Proceeds

would be used by OL and Castle to repay the Castle Facility, and provided that the parties to the

letter would negotiate in good faith on the allocation of the remaining proceeds, considering the

best interests of OL and the Octaviar Group generally.  (Id.)  The sale of the Stella Group closed

on the same day, and $189,897,919 of the proceeds of the sale (the "Fortress Payment") were

transferred from Global directly to FCCA2 to repay the outstanding amount of the Castle Facility. (Id. ¶¶ 102, 107) These proceeds were subsequently transferred in whole or in part to Drawbridge in New York, either directly from FCCA2 or indirectly through the other Australian Fortress Entities or their U.S. affiliates. (Id. ¶ 108)

The cumulative effect of the Deed of Release, the Repayment Deed, and the Allocation Letter was that (1) OA's interest in and entitlement to approximately $200 million of the Stella Sale Proceeds based on its status as the sole intercompany creditor of the Stella Group was diverted to FCCA2 for no consideration and no assurance of any future consideration—the agreement in the Allocation Letter as to the distribution of the remaining Stella Sale Proceeds provided only for a negotiation with other Octaviar Group entities in good faith— and (2) OA released and discharged between $737 million and $1.34 billion of intercompany loans that would otherwise be owed to it by the Stella Group. Id. ¶ 104. Neither the Repayment Deed nor the Allocation Letter were approved by the boards of directors of OA or OL. (Id. ¶¶ 98, 105)

In late 2008 and early 2009, subsequent to the commencement of OA's insolvency proceedings but prior to the appointment of the Liquidators and conversion of the proceedings from a reorganization to a liquidation, two additional transfers of part of the remaining Stella Sale Proceeds were made to FCCA2. The Liquidators allege that these payments were made by the OA administrators based on their erroneous belief that the funds were held in trust for OL, and that OL was an intercompany creditor of the Stella Group as reflected in the allegedly incorrect Repayment Deed. (Id. ¶ 115) On December 23, 2008, the administrators of OA transferred $19,746,713.63 of the Stella Sale Proceeds (the "December 2008 Payment") to the receivers and managers of OL; upon receipt, OL transferred the same sum to FCCA2. (Id. ¶¶ 112-13) These funds remain held in an escrow account of FCCA2. (Id. ¶

113)  On February 4, 2009, the administrators of OA transferred $304,331.05 (the "February 2009 Payment") to the receivers and managers of OL; this amount was interest earned on the money transferred in the December 2008 Payment.  (Id. ¶ 114)  Upon receipt, OL transferred the February 2009 Payment to Fortress; these funds were deposited in, and remain in, the same escrow account.  (Id.)  Together with the Fortress Payment of February 29, 2008, a total of approximately $210 million of the Stella Sale Proceeds was transferred to FCCA2.

D.  The Australian Insolvency Proceedings

On October 3, 2008, the directors of OA placed the company into voluntary administration in Australia pursuant to the insolvency provisions of the Corporations Act. (Compl. ¶ 150)  On July 31, 2009, the Supreme Court of Queensland, Australia, terminated OA's deed of administration, and pursuant to section 446B of the Corporations Act and regulation 5.3A.07 of the Australian Corporations Regulations 2001, OA was deemed to have passed a special resolution for its own voluntary liquidation.  (Id.)  On September 9, 2009, the Liquidators were appointed as liquidators of both OA and OL, which had also entered into voluntary liquidation.  (Barnet Decl. ¶ 3)

Under applicable Australian law, a liquidator is primarily responsible for (1) winding up the affairs of the company, (2) equitably distributing the company's assets amongst its creditors and stakeholders, and (3) examining and investigating the circumstances precipitating the liquidation.  (Atkins Decl. ¶ 16)  A liquidator is also charged with statutory duties to ascertain the company's assets and liabilities, to take control of assets identified, and to liquidate the assets in the course of winding up the company in order to maximize a distribution to creditors and stakeholders.  (Id. ¶ 18)  To fulfill these duties, a liquidator may undertake

investigations to locate and recover assets, explain the circumstances leading to liquidation to interested parties, identify any dispositions or transactions that may form the basis for a recovery under the Corporations Act's avoidance provisions, and assist in the examination and/or prosecution of persons connected with the company.  (Id. ¶ 19)

In the course of their investigation of the circumstances leading up to OA's liquidation, the Liquidators conducted "public examinations" pursuant to section 596A and 596B of the Corporations Act.  Public examinations are inquisitorial proceedings held before a court. (Id. ¶ 25)  Under Australian law, the records of a public examination may be used in any future judicial proceeding, in contrast to documents obtained through compulsory process.  (Id. ¶¶ 50-51) The Liquidators conducted public examinations of numerous former officers and directors of OA, other entities in the Octaviar Group, and several current and former officers and employees of FCCA2 and FIGA including Kelleher and Kwei.  (Id. ¶¶ 31-32)


E.  The Australian Action

On April 6, 2010, the Liquidators in their capacity as liquidators of OL commenced proceedings in the Supreme Court of Queensland against FCCA2, bringing claims under the voidable transactions provisions of the Corporations Act and seeking the recovery of approximately $35,000,000 (plus interest and costs) (the "OL Action").  (Atkins Decl. ¶ 38) Subsequently, in the course of their investigations, the Liquidators learned that OA had a claim against FCCA2 that was separate and distinct from the claim commenced by OL in the OL Action.  (Id. ¶ 39)  Accordingly, upon application of the Liquidators, on December 8, 2011 a special purpose liquidator was appointed to oversee the OL Action.  (Id.)  A special purpose liquidator is appointed by a court in order to carry out a specific function in a company's

liquidation, most commonly where a position of conflict is anticipated to arise or actually does arise with the acting liquidator.  (Id.)

On April 3, 2012, the Liquidators in their capacity as liquidators of OA commenced proceedings in the Supreme Court of Queensland against FCCA2, FIGA, and two directors of OA, David Anderson and Craig White, seeking the recovery of approximately $210,000,000 (plus interest and costs) (the "OA Action").  (Id. ¶ 40)  On September 21, 2012, the OA Action was amended to add the remaining Australian Fortress Entities as defendants. (Id.)  The claims in the OA Action seek to set aside three payments made to FCCA2 in 2008 and early 2009 based on section 588FB of the Corporations Act, which concerns "uncommercial transactions" (fraudulent transfers) and based on a knowing breach of the OA directors' duties under the Corporations Act and the assistance and facilitation thereof by the Australian Fortress Entities.  (Id. ¶ 41)  The two trials were consolidated into a single proceeding (the previously identified Australian Action) on application of the Liquidators on August 8, 2013.  (Id. ¶ 45)  At a recent conference, the presiding judge indicated that he would set the consolidated trial to begin in the first half of 2015.  (Id. ¶ 47)

On September 18, 2012, the Australian Court granted an interim freezing order (the "OA Freezing Order") preventing the Australian Fortress Entities from removing certain assets from Australia.  (Compl. ¶ 158)  The Australian Fortress Entities subsequently consented to the OA Freezing Order remaining in place until the claims in the Australian Actions were decided.  (Id. ¶ 159)  The OA Freezing Order was not granted against the U.S. Defendants, and its terms do not attach to any assets held by or transferred to the U.S. Defendants.  (Atkins Decl. ¶ 60)  The OA Freezing Order applies to no more than $189 million of assets—i.e., the amount of the Fortress Payment.  (OA Freezing Order, Atkins Decl. Ex. R at 3)  Further, the Liquidators

allege that the December 31, 2013 financial statements of the Australian Fortress Entities

indicate a net asset position significantly below the amount called for by the OA Freezing Order,

and that in any event the OA Freezing Order applies to substantially less than the $342 million

that the Liquidators seek to recover.  (Atkins Decl. ¶ 63)


F.  The Chapter 15 Proceedings

On August 13, 2012, the Liquidators filed a verified petition pursuant to Chapter

15 of the Bankruptcy Code for recognition of the OA liquidation as a foreign main proceeding in

the United States Bankruptcy Court for the Southern District of New York.  In re Octaviar

Admin. Pty Ltd., No. 12-13443 (SCC) (Bankr. S.D.N.Y.).  The Liquidators sought this relief in

order to facilitate their investigation and prosecution of claims of the estate and to compel the

production of documents in the possession of the U.S. Defendants, which they were unable to

obtain in the Australian Action because of the U.S. Defendants' objection to the personal

jurisdiction of the Australian courts.  (Atkins Decl. ¶¶ 66, 68)  Defendant Drawbridge objected to

recognition.

After briefing and a hearing, on September 6, 2012 the bankruptcy court

(Chapman, U.S.B.J.) entered an order granting recognition of the OA liquidation proceeding.

(Dkt. No. 18, Case No. 12-13443 (Bankr. S.D.N.Y.)  The Court of Appeals for the Second

Circuit agreed to hear a direct appeal from the order.  On December 11, 2013, that court issued a

decision holding that in order to obtain recognition, a putative Chapter 15 debtor must satisfy the

requirements of 11 U.S.C. § 109(a) by residing in or having a domicile, place of business, or

property in the United States.  In re Barnet, 737 F.3d 238, 247 (2d Cir. 2013).  Because the

Liquidators had made no attempt to establish that OA had a domicile, place of business, or

- 14 -

property in the United States, the court vacated the recognition order and remanded the case to the bankruptcy court for further proceedings.  Id.

On February 27, 2014, the Liquidators filed a second verified petition for recognition.  In re Octaviar Admin. Pty Ltd., No. 14-10438 (SCC) (Bankr. S.D.N.Y.)  On June 19, 2014 the bankruptcy court issued a memorandum decision granting recognition of the OA liquidation proceeding for a second time.  In re Octaviar Administration Pty Ltd., 511 B.R. 361 (Bankr. S.D.N.Y. 2014).  The bankruptcy court held that the liquidators' claims in the actions before this Court and the state court constitute U.S. property to support recognition under Chapter 15.

G.  The Instant Proceedings

The Court set a briefing schedule at the continued conference held on June 2, 2014.  Pursuant to this schedule, defendants filed two separate motions to dismiss: one based on forum non conveniens, and a second asserting other grounds.  In a memorandum and order dated August 27, 2014 (the "FNC Decision"), this Court denied defendants' motion to dismiss based on forum non conveniens, holding that Australia was not an adequate alternative forum for the instant suit because (1) defendants were equitably estopped from consenting to the jurisdiction of the Australian courts, and (2) the Liquidators made an adequate showing that personal jurisdiction over the U.S. Defendants could not be obtained absent consent.  (Dkt. No. 56)

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.' " <u>Ashcroft v. Iqbal</u>, 556 U.S. 662,

678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  In assessing a

complaint, courts draw all reasonable inferences in favor of the non-movant.  <u>See</u> <u>In re Elevator</u>

<u>Antitrust Litig.</u>, 502 F.3d 47, 50 (2d Cir. 2007).  Legal conclusions, however, are not entitled to

the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.

<u>Iqbal</u>, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations,

if any, "and then determine whether they plausibly give rise to an entitlement to relief."  <u>Id.</u> at

679.

   "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally."  Rule 9(b), Fed. R. Civ. P.


## DISCUSSION

   Defendants move to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P, on several

grounds.  First, defendants argue that the complaint substantially focuses on actions taken in

Australia by the defendants in the Australian Action and consequently generally fails to support

the imposition of liability on any of the U.S. Defendants.  Second, defendants raise a series of

statute of limitations defenses.  Third, defendants argue that plaintiffs' claims under New York

law fail to state a claim.  Arguing in the alternative, defendants contend that if the action is not

dismissed under Rule 12(b)(6), it should be dismissed or stayed in deference to the Australian

Action on the ground of international comity.

A.  <u>Direct Liability Against Defendants</u>

Defendants argue that plaintiffs have failed to plead facts that could support the imposition of liability on defendants through either direct or indirect claims.  Specifically, they contend that plaintiffs' allegations do nothing more than indirectly attribute the actions of the defendants in the Australian Action—i.e., the Australian Fortress Entities and former OA directors Anderson and White—to the defendants here, in a conclusory manner.  They further argue that the complaint lacks any allegation identifying any specific conduct taken by any defendant that has any connection to OA.

Defendants cite several cases in which claims were dismissed because plaintiffs failed to allege facts connecting defendants to tortious acts committed by other actors.  <u>Dumont v. Litton Loan Servicing, LP</u>, 12-CV-2677 (ER) (LMS), 2014 WL 815244, at *18-19 (S.D.N.Y. Mar. 3, 2014) (dismissing claims against the parent companies of a mortgage servicer where plaintiffs made only conclusory and unsupported allegations of direction, control, and/or participation in the servicer's policies); <u>Liu Bo Shan v. China Const. Bank Corp.</u>, 421 F. App'x 89, 92-93 (2d Cir. 2011) (summary order) (affirming dismissal of a claim where plaintiff sought to hold defendant bank liable for law enforcement acts attributable to the government of China); <u>Abdelhamid v. Altria Grp., Inc.</u>, 515 F. Supp. 2d 384, 397-98 (S.D.N.Y. 2007) (dismissing claims based on the electrocution of a concertgoer in Egypt against American companies where there were no allegations that those responsible for setting up the allegedly unsafe area were employees or agents of the American companies); <u>Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC</u>, 861 F. Supp. 2d 344, 375 (S.D.N.Y. 2012) (dismissing plaintiff's claims against a parent company where the complaint alleged only that the parent company "actively participated in an intentional scheme" without any supporting allegations).

Here, plaintiffs allege that "[i]n their capacity as directors of [FCCA2], FIGA and the other Australian Fortress Entities, the Director Defendants . . . were responsible for all major decisions by the Australian Fortress Entities, including all major decisions concerning [FCCA2] and/or FIGA's dealings with the Octaviar Group."  Compl. ¶ 27.  Similarly, the complaint alleges that Drawbridge and Fortress "approved any and all transactions entered into by [FCCA2] and/or FIGA regarding the Octaviar Group and the Castle Facility."  Id. ¶¶ 21, 23; see also id. ¶ 28 ("The Director Defendants controlled, directed and supervised [FCCA2] and FIGA, and authorized and approved the scheme to divert funds from OA to [FCCA2].")  According to the complaint, decisions made by the Director Defendants were relayed to the Australian Fortress Entities by Kelleher and Kwei during "regular discussions with the Defendants in New York, including Wednesday morning telephone conferences and additional telephone and email communications to discuss matters relating to the Octaviar Group."  Id. ¶ 46.  Contrary to defendants' argument, the foregoing allegations are not made in a conclusory fashion.  The complaint sets forth a detailed set of allegations purporting to establish the defendants' domination and control of the Australian Fortress Entities, citing specific sworn testimony from the depositions and public examinations of Kelleher and Kwei, a director and officer, respectively, of FCCA2 and FIGA.  Id. ¶¶ 41-47.  The complaint further alleges that, in turn, FCCA2, FIGA, Kelleher, and Kwei exercised domination and control over OA, Anderson, and White in connection with the Stella Sale.  Id. ¶ 130.

Taken together, the foregoing allegations constitute a sufficient factual predicate to support the imposition of liability on the defendants here for actions taken by the Australian Fortress Entities.  The facts of this case differ substantially from the cases cited by defendants: in each of those cases, the plaintiff made only conclusory allegations of control and direction by the

parent entity unsupported by any specific factual allegations or evidence. Here, plaintiffs set forth specific factual allegations of such control and direction, and the allegations, accepted as true for the adjudication of the instant motion, are further supported by specific testimony incorporated into the complaint.

Separately, defendants argue that plaintiffs' claims should be dismissed because the complaint uses collective or aggregated allegations that lump all the defendants together without providing any factual allegations to distinguish their conduct. Defendants contend that the complaint thus runs afoul of Rule 8(a), Fed. R. Civ. P., citing Ochre LLC v. Rockwell Arch. Plan and Design, P.C.. 12-cv-2837 (KBF), 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants." (citing Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order))). "Dismissal [under Rule 8], however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995) (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988)).

Defendants' lumping argument is unavailing. The complaint alleges that "[i]n their capacity as directors of [FCCA2], FIGA, and the other Australian Fortress Entities, the Director Defendants . . . were responsible for all major decisions by the Australian Fortress Entities, including all major decisions concerning [FCCA2] and/or FIGA's dealings with the Octaviar Group." Compl. ¶ 27. It further alleges that "each of the Director Defendants was involved in making decisions on behalf of [FCCA2]," id. at ¶ 42, and that the defendants "had regular discussions with [Kelleher and Kwei], including weekly Wednesday morning telephone conferences and additional telephone and email communications to discuss matters relating to

the Octaviar Group, id. at ¶ 46.  The testimony incorporated into the complaint shows that each of the Director Defendants, and not only Dakolias, are principal decision-makers for FCCA2. Compl. ¶ 42.

Accordingly, the complaint will not be dismissed based on a general failure to establish a basis for direct or indirect liability against any of the U.S. Defendants.


B.  Allegations Sounding in Fraud

Rule 9(b) applies to all allegations of fraud and to all claims that sound in fraud, as determined by the wording and imputations of the complaint, regardless of the labels used in the pleading.  See Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004) (applying Rule 9(b) where "the wording and imputations of the complaint [were] classically associated with fraud"). In this case, each of plaintiff's claims incorporates allegations that the defendants "drafted and/or caused [FCCA2] and their counsel . . . to Draft the Stella Proceeds Deed," which contained four recitals regarding the intercompany loan positions of entities in the Stella Group and Octaviar Group that were "blatantly incorrect" and "falsely stated" certain aspects of these positions Compl. ¶¶ 91, 92.  These allegations sound in fraud, and accordingly the complaint "must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b), Fed. R. Civ. P.

To plead a fraudulent misstatement, "the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 108 (2d Cir. 2012) (citation and internal quotation marks omitted).  In determining whether fraud has been pled with sufficient particularity, a court must read the complaint generously, and draw all inferences in favor of the plaintiff.  Cosmas v.

Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  Furthermore, Rule 9(b) must be read in conjunction with

Rule 8(a), which requires plaintiffs to plead only a short, plain statement of the grounds upon

which they are entitled to relief.  Ross v. A.H. Robins Co., 607 F.2d 545, 557 n.20 (2d Cir.

1979).

       The Liquidators identified four specific statements included in the Stella Proceeds

Deed concerning the indebtedness of certain entities in the Stella Group to certain entities in the

Octaviar Group.  Compl. ¶ 91.  The complaint alleges that the defendants "drafted and/or caused

[FCCA2] and their counsel . . . to draft the Stella Proceeds Deed."  Id.  The defendants allegedly

caused Castle, OA, OL, MFSL, Stella Holdings, and FCCA2 to execute the Stella Proceeds Deed

on February 29, 2008.  Id. ¶ 96.  The statements were allegedly fraudulent because they

substantially misrepresented the true intercompany loan positions of entities in the Stella Group

and Octaviar Group.  Specifically, the statements indicated that LRH owed approximately $819

million to OL and approximately $43 million to Sunleisure even though the Stella Group

Restructure left OA as the Stella Group's only substantial intercompany creditor.  Id. ¶ 91.  The

administrators of OA, who preceded the Liquidators as OA's representatives in its insolvency

proceedings, were allegedly misled by this false characterization in connection with the August

2008 and February 2009 Payments.  Id. ¶ 115.  Through these misrepresentations, defendants are

alleged to have obtained repayment in full of over $200 million in loans to entities in the

Octaviar Group—money that OA, as the Stella Group's only substantial intercompany creditor,

was entitled to.  Id. ¶ 104.

       Defendants' objection that the Liquidators did not allege defendants' knowledge

of the misstatements with sufficient particularity also fails.  "Malice, intent, knowledge, and

other condition of mind of a person may be averred generally."  Rule 9(b), Fed. R. Civ. P.

"Therefore, the actual fraudulent statements or conduct and the fraud alleged must be stated with particularity, whereas the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity."  Chill v. General Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) (citing Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994)) (internal citations omitted).  Nevertheless, "since Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit . . . to serve the purposes of Rule 9(b), we require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (citations and internal quotations omitted).

The complaint alleges that "[t]he Defendants knew that the recitals to the Stella Proceeds Deed not only were inconsistent with the Deed of Release, but also were wrong."  Compl. ¶ 95.  The basis for the defendants' knowledge is set forth with particularity in both the instant complaint and the complaint in the Australian Action, which is cited and incorporated by reference throughout the complaint in this action.  Specifically, FCCA2 "received information indicating that at all material times after the [Stella Restructure]: (i) OA was the only company in the Octaviar Group that had any, or any substantial, loans to companies in the Stella Group; and (ii) no company within the Stella Group had any, or any substantial, indebtedness to OL or Sunleisure Group."  Australian Compl. ¶ 43, Dkt. No. 2, Ex. B to Ex. A; see also id. ¶ 51 (alleging knowledge on the part of FCCA2 and FIGA); Compl. ¶ 95 (alleging knowledge on the U.S. Defendants' part and citing the Australian Complaint).  This information was sent from Anderson and other individuals associated with the Octaviar Group to Kelleher and Kwei through a series of six emails on six specific dates from June 5, 2007 through February 28, 2008.

Australian Compl. ¶ 43.  Kelleher and Kwei received detailed information regarding the financial condition of the Octaviar Group and Stella Group pursuant to the terms of the amendments to the Castle Facility, and regularly relayed this information to the U.S. Defendants.  Compl. ¶¶ 46-47, 52, 67, 79.  This information was conveyed in the course of regular communications between Kelleher and Kwei and the U.S. Defendants, including weekly Wednesday morning telephone conferences and further phone and email communications.  Id. ¶ 46.  On this basis, the complaint alleges that "at all times following the Stella Restructure, the [U.S.] Defendants, [FCCA2], and FIGA were well aware" of the intercompany loan position described above.  Id. ¶ 79 (citing Australian Compl. ¶ 43).  The defendants also received the Deed of Release, which allegedly accurately set forth the intercompany loan position; the complaint alleges that after receiving the Deed of Release, the defendants caused FCCA2 and/or FIGA to demand the execution of the Stella Proceeds Deed.  Id. ¶ 90.

Kelleher and Kwei were also controlled, directed, and supervised by the Director Defendants; the U.S. Defendants approved all transactions between FCCA2 and the Octaviar Group, and also made all major decisions for both FCCA2 and FIGA.  Compl. ¶¶ 10, 41-42.  Based on the foregoing and drawing inferences in favor of plaintiffs, Cosmas, 886 F.2d at 11, the Liquidators have set forth their allegations sounding in fraud with an adequate degree of particularity, and have alleged facts giving rise to a strong inference that the defendants knew that the specified misstatements in the Stella Proceeds Deed were false.

C.  Statute of Limitations

Defendants argue that each of Counts I-III, V-VIII, and X-XIV is barred by the applicable statute of limitations, which they contend is three years in each case.  In response, the

Liquidators rely on, inter alia, the doctrines of equitable estoppel and equitable tolling based on fraudulent concealment by the defendants.

"[T]he purpose of the fraudulent-concealment doctrine is to prevent a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.' " State of N.Y. v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988) (quoting Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349 (1874)).  A plaintiff demonstrates fraudulent concealment sufficient to toll the running of applicable statutes of limitations where "he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within [the time period set forth by the applicable statute of limitations] of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part."  Id.  The element of concealment by the defendant may be proven "by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing."  Id.

The Liquidators claim that the defendants' domination and control of Anderson, White, OA, and related entities in the Octaviar Group gave the transfer of a portion of the Stella Sale Proceeds to the Australian Fortress Entities an appearance of legitimacy and thus concealed certain facts essential to the Liquidators' claims.  The two documents implementing the transfer—the Stella Proceeds Deed and the Allocation Letter—were private documents executed by Anderson and White without the approval of the OA board of directors.  (Compl. ¶¶ 95, 115) Because OA is a private company, and the directors engaging in the allegedly corrupt conduct at issue, Anderson and White, are alleged to have been under the control of the defendants, the

wrongful acts relating to the Stella Proceeds Deed and subsequent transfer were inherently self-concealing.  Until the Liquidators' appointment, no entity was in a position to uncover the alleged misrepresentations in the Stella Proceeds Deed; until the Liquidators conducted an extensive investigation of OA's pre-insolvency affairs pursuant to their investigative powers under Australian law, there were no outward signs that the sale of the Stella Group included any improper conduct.

On this basis, the Liquidators have pled concealment and domination sufficient to fall within the doctrine of equitable tolling and avoid dismissal based on statute of limitations defenses at the pleading stage.  See Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia, 23 F. Supp. 2d 439, 447 (S.D.N.Y. 1998) ("Defendants have pled concealment and domination sufficiently to avoid dismissal of the counterclaims at this point. Until the issues of domination and control, which are fact based, are more fully litigated, the statute of limitations must be deemed not to have expired.").  Defendants' argument that the Liquidators' commencement of the OL Action—a separate lawsuit brought in Australia on behalf of a separate entity—in April 2010 indicates the Liquidators' knowledge and awareness of the facts upon which they brought this action is a fact-based contention not properly asserted on a motion to dismiss.

Assuming, as defendants argue, that a three-year statute of limitations applies to the purportedly time-barred claims, the Liquidators' claims would be timely as long as they were brought within three years of the Liquidators' discovery of the causes of action raised here.  The earliest indication of the Liquidators' awareness of any claim against any of the Australian Fortress Entities on behalf of OA was on or about December 8, 2011, when the Liquidators sought the appointment of a special purpose liquidator for OL in order to avoid a potential anticipated conflict between the interests of OL and OA in relation to separate claims against

FCCA2.  Compl. ¶ 39.  The Liquidators could not have discovered the claims in this case,
against the U.S. Defendants, until after their initial discovery of claims on behalf of OA; the
Australian suit against OA was not filed until April 3, 2012.  The complaint in this action was
filed on February 27, 2014.  Accordingly, the Liquidators have pled facts adequately and
plausibly to fall within the doctrine of equitable tolling, and defendants' motion to dismiss on
statute of limitations grounds will be denied.

   D.   Failure to State a Claim

            With respect to each of the Liquidators' claims under New York law, defendants
contend that the Liquidators' complaint fails to state a claim upon which relief may be granted.
Specifically, on this basis defendants move to dismiss Counts II (fraudulent transfer), III (aiding
and abetting a fraudulent transfer), V (aiding and abetting a breach of a fiduciary duty), VIII
(unjust enrichment), XI (conversion), XII (aiding and abetting Fortress's conversion), XIII
(aiding and abetting Drawbridge's conversion), and XIV (tortious interference with contractual
relations).  Each claim is addressed in turn.

         1.   Fraudulent Transfer Under New York Law

            Count II of the complaint purports to set forth a claim of fraudulent transfer under
sections 520 through 529 of the New York Debtor and Creditor Law ("NYDCL").  As a
threshold matter, defendants challenge the Liquidators' standing to assert such a claim.

            In general, the issue of standing does not arise when bankruptcy trustees such as
the Liquidators seek to avoid a fraudulent transfer made by the insolvent entity.  This is because
section 544(b) of the Bankruptcy Code confers upon such trustees the ability to stand in the

shoes of the bankruptcy estate's unsecured creditors and "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1). The Liquidators in this case, acting as foreign representatives in the Chapter 15 Proceeding, successfully obtained recognition of OA's Australian insolvency proceeding pursuant to Chapter 15 of the Bankruptcy Code. In re Octaviar, 511 B.R. at 375. However, section 1521(a)(7) of the Bankruptcy Code expressly precludes a court from granting for a foreign representative "relief that may be available to a trustee . . . under section . . . 544 . . . ." 11 U.S.C. § 1521(a)(7). In the context of a grant of recognition of a foreign proceeding under Chapter 15, a foreign representative has standing to initiate a fraudulent transfer action only "in a case concerning the debtor pending under another chapter of [Title 11] . . . ." 11 U.S.C. § 1523. Thus, with this path statutorily foreclosed, the Liquidators brought their fraudulent transfer claim under the NYDCL, raising the question of whether the Liquidators have standing to bring such a claim under New York law.

Relying chiefly on Eberhard v. Marcu, 530 F.3d 122, 129-33 (2d Cir. 2008), defendants argue that the Liquidators lack standing. They contend that under the NYDCL, only a creditor of the transferor of an alleged fraudulent transfer has standing to assert a claim that the transfer was fraudulent, and that the Liquidators in their capacity as representatives of the OA estate neither are nor represent creditors. In Eberhard, the Second Circuit denied standing to bring a claim under section 276 of the NYDCL to a court-appointed securities receiver. Id. at 133. The court held that "a receiver's standing to bring a fraudulent conveyance claim will turn on whether he represents the transferor only or also represents a creditor of the transferor." Id. Because the receiver did not represent any creditor of the transferor, the court held that he lacked standing to set aside the allegedly fraudulent conveyance under NYDCL section 276. Id. The

defendants contend that in this case, the Liquidators' role is analogous to that of the Eberhard receiver in that the Liquidators represent only the transferor estate and do not represent the estate's creditors.

The text of the NYDCL states that transfers challenged under its fraudulent conveyance provisions are voidable only as to certain creditors.  Section 276 of the NYDCL provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  NYDCL § 276; accord NYDCL §§ 273 (conveyance made by a person thereby rendered insolvent is fraudulent as to creditors); 274 (conveyance by a person engaging in business or transaction leaving transferor with unreasonably small capital is fraudulent as to creditors and those who become creditors during continuance of such business or transaction), 275 (conveyance by a person about to incur debts beyond his ability to pay as they mature is fraudulent as to both present and future creditors), 277 (conveyance of partnership property where partnership is or will be rendered insolvent is fraudulent as to partnership creditors).  The court in Eberhard focused on the final clause of section 276 in observing that an alleged fraudulent conveyance "is not void per se, but voidable by creditors of the transferor."  530 F.3d at 129.

The Liquidators seek to distinguish Eberhard, arguing that unlike the receiver in that case, they stand in the shoes of creditors of the OA estate.  They note that under Australian law, a liquidator has "standing to commence proceedings to avoid the impugned disposition or transaction and recover the property or money for the benefit of the company's creditors." Atkins Decl. ¶ 20.  However, the Liquidators fail to explain the significance of this provision of Australian law to whether they have standing to assert a similar claim under the NYDCL.  In a

footnote in Eberhard, the Second Circuit rejected a similar argument that a receiver's authorization under the New York Estate Powers & Trusts Law to assert a state law fraudulent conveyance claim on behalf of creditors overcame the express language of NYDCL section 527. 530 F.3d at 133 n.8 ("Nor does a statute that explicitly authorizes fiduciaries to act on behalf of creditors convey standing under an entirely different statute that just as explicitly limits relief only to creditors."). This principle applies with equal force in the context of the Liquidators' reliance on a provision of Australian law to circumvent the express limitations set forth in the relevant provisions of the NYDCL. Further, while Eberhard concerned a court-appointed receiver and recognized that an equitable receivership is distinct from a liquidation or other insolvency proceeding, 530 F.3d at 132, its reasoning applies with equal force to the unusual circumstance of a bankruptcy trustee seeking to bring claims under the NYDCL without reliance on 11 U.S.C. § 544(b).

The Liquidators' reliance on Friedman v. Wahrsager, 848 F. Supp. 2d 278, 293 (E.D.N.Y. 2012), is misplaced. There, the court rejected defendants' Eberhard-based standing argument because the receiver—who represented both the transferor and two businesses that were creditors of the transferor—asserted fraudulent transfer claims under the NYDCL on behalf of the creditors rather than the transferor. Id.

In contrast, even though the Liquidators owe a statutory fiduciary duty to creditors of the insolvent estate under Australian law, see Atkins Decl. ¶¶ 18-19, they appear in this action in their capacity as liquidators of the OA estate and not as representatives of any creditors of the estate.

The Liquidators' reliance on Fed. Nat. Mortgage Ass'n v. Olympia Mortgage Corp., 04-CV-4971 (NG) (MDG), 2011 WL 2414685, at *7 (E.D.N.Y. June 8, 2011), is similarly

unavailing.  The court in <u>Olympia</u> rejected a challenge to a receiver's standing by relying on an exception to the general rule that a transferor cannot subsequently avoid its own transfer as fraudulent.  <u>Id.</u>  This standing exception applies where a corporation is so dominated and controlled by its management that the conveyance of its assets is properly considered an act of management rather than an act of the corporation itself.  <u>Id.</u>  The exception was recognized in <u>Scholes v. Lehmann</u>, 56 F.3d 750 (7th Cir. 1995) (Posner, J.), the case on which <u>Eberhard</u>'s standing-related holding was based.  <u>See</u> <u>Eberhard</u> at 132-33.  In <u>Scholes</u>, corporations in receivership were used by their management in a Ponzi scheme as conduits to convey funds belonging to the corporations.  <u>Id.</u> at 754.  The <u>Scholes</u> court described the corporations as the wrongdoing manager's "robotic tools" and "evil zombies."  <u>Id.</u>  Analogizing to <u>Scholes</u>, the <u>Olympia</u> court rejected a challenge to a receiver's standing where the receiver sought to recover funds fraudulently conveyed from Olympia, the entity in receivership, to other entities by Samuel Pinter, a principal shareholder of Olympia as to whom the court had already pierced the corporate veil and held personally responsible for Olympia's liabilities to certain creditors.  2011 WL 2414685 at *1, *7.  In this case, although the Liquidators have alleged that OA directors Anderson and White "acted in accordance with directions and instructions given to them by" the Fortress Entities, there is no allegation that OA was a mere conduit so totally controlled by its corrupt management that <u>Scholes</u> standing would apply.

Accordingly, this Court holds that the Liquidators lack standing to maintain a claim of fraudulent transfer under the NYDCL, and Count II will therefore be dismissed for failure to state a claim.

2.   Aiding and Abetting Fraudulent Transfer

Against all defendants, the Liquidators bring a claim of aiding and abetting fraudulent transfers under New York law.  The parties disagree as to whether such a claim is cognizable under New York law.  See Federal Deposit Ins. Corp. v. Porco, 75 N.Y.2d 840, 842 (1990) (affirming the dismissal of plaintiff's aiding and abetting claim and stating that "the statute . . . cannot fairly be read as creating a remedy against nontransferees who . . . are not alleged to have dominion or control over the assets or to have benefitted in any way from the conveyance."); Atlanta Shipping Corp., Inc. v. Chem. Bank, 631 F. Supp. 335, 348 (S.D.N.Y. 1986) aff'd, 818 F.2d 240 (2d Cir. 1987) ("We do not believe it is possible to state such a claim . . . .  An aiding and abetting claim against someone other than a transferee is meaningless in these circumstances."); Amusement Indus., Inc. v. Midland Ave. Assocs. LLC, 820 F. Supp. 2d 510, 533 (citing Atlanta Shipping and characterizing claims for aiding an abetting a fraudulent transfer as "factitious"); but see Shefner v. Beraudiere, No. 112525/2011, 2013 WL 6143336, at *7 (N.Y. Sup. Ct. Nov 12, 2013) (declining to dismiss a claim against defendant "for his purported involvement in the alleged fraud since there is a claim that he had 'dominion or control over [the asset] and [he] derived benefit from [the] conveyance.' " (quoting Blakeslee v. Rabinor, 182 A.D.2d 390, 391 (1st Dep't 1992))).

It is unnecessary to reach this issue because the Court has already concluded that the Liquidators lack standing to bring a fraudulent transfer claim.  The limited support in New York case law for the arguable recognition of an aiding and abetting fraudulent transfer claim relies on the statutory provisions of the NYDCL, which as discussed above provides rights only to creditors and not to a representative of the transferor who does not represent creditors of the transferor.  Thus, even if New York law recognizes a claim for aiding and abetting a fraudulent

transfer, such a claim may only be asserted by a creditor or an entity representing the creditors. The Liquidators are neither.  Accordingly, Count III of the complaint is dismissed for failure to state a claim.

       3.  <u>Aiding and Abetting a Breach of Fiduciary Duty</u>

In order to state a claim for aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must establish three elements: (1) the existence of a breach of a fiduciary obligation, of which the aider and abettor had actual knowledge; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damages as a result of the breach.  <u>In re Sharp Int'l Corp.</u>, 403 F.3d 43, 49-50 (2d Cir. 2005) (citing <u>Kaufman v. Cohen</u>, 760 N.Y.S.2d 157, 169 (1st Dep't 2003)); <u>accord</u> <u>Wechsler v. Bowman</u>, 285 N.Y. 284, 291 (1941) ("Any one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the <u>cestuis</u> <u>qui</u> trust.").

With respect to the second element, inducement is "[t]he act or process of enticing or persuading another person to take a certain course of action."  <u>In re Sharp</u>, 403 F.3d at 50 (quoting Black's Law Dictionary at 790 (8th ed. 2004)).  "A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator."  <u>Id.</u> (quoting <u>Kaufman</u> at 126).  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  <u>Id.</u> at 52 (citation omitted).

A plaintiff alleging aiding and abetting claims sounding in fraud must also plead the elements of aiding and abetting with particularity.  <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 292-93 (2d Cir. 2006) (citing <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 92-93 (2d Cir. 1983)

(applying New York law to an aiding and abetting fraud claim and explaining that "plaintiffs . . . have failed to allege actual knowledge of fraud with the particularity necessary to survive the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)"); Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 245 (S.D.N.Y. 1996) (citing S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir. 1987)) (applying Rule 9(b) to aiding and abetting breach of fiduciary duty claim because the underlying primary violation was based on fraud).

    In moving for the dismissal of the Liquidators' claim for aiding and abetting a breach of fiduciary duty, defendants have not disputed that the Liquidators have satisfied the first and third elements. See Compl. ¶¶ 116-29, 208-10 (alleging, in extensive detail, primary breaches by OA directors Anderson and White); 130-31, 211 (alleging defendants' knowledge of the primary breaches); 215 (alleging damages caused by the breaches in the form of an approximately $210 million deprivation of proceeds). Instead, defendants raise two arguments relating to the second required element of showing that defendants knowingly induced or participated in the breach. First, they contend that the actions allegedly taken by defendants simply facilitated the repayment of a valid debt to the Australian Fortress Entities, and that as a matter of law such actions do not establish the knowing inducement element. See Sharp, 403 F.3d at 51 ("Under the circumstances, the demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability."). Second, they argue that the Liquidators failed to plead the element of participation or inducement with sufficient particularity to satisfy the requirements of Rule 9(b), as is required because their claims sound in fraud.

    With respect to the defense of facilitating the repayment of a debt, defendants' argument fails. In Sharp, the Second Circuit affirmed the dismissal of a bankruptcy trustee's

- 33 -

claim against a bank for aiding and abetting the fiduciary breach of the insolvent entity's controlling shareholders.  403 F.3d at 46.  Discussing the element of inducement or participation, the court found that the defendant bank's demand that the debtor obtain new financing to retire a debt owed to the bank could not be considered an inducement even though such a demand exerted some pressure on the debtor.  Id. at 51.  Because the bank was demanding no more than what it was owed under an existing debt and further had a right to foreclose on the debt, the court held that "[u]nder the circumstances, the demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability."  Id.  The other two cases relied upon by defendants applied the analysis of the Sharp court to similarly hold that a mere demand for the repayment of a bona fide debt does not constitute a corrupt inducement to establish aiding and abetting liability.  Schwan's Sales Enterprises, Inc. v. Commerce Bank & Trust Co., 397 F. Supp. 2d 189, 200 (D. Mass. 2005); Liberty Sav. Bank, FSB v. Webb Crane Serv., Inc., No. 03 Civ. 2218 (REB), 2005 WL 1799300, at *3 (D. Colo. July 27, 2005).

        In contrast to these three cases, these defendants are alleged to have done far more than make a mere demand for the repayment of an outstanding debt.  The complaint alleges that through the amendments to the Castle Facility, defendants obtained effective veto power over the Stella Sale, then used this power to demand, as a condition of allowing the sale to close, the execution of the Stella Proceeds Deed, a document that substantially misstated the intercompany loan position of the Stella Group and the Octaviar Group and further provided for the immediate repayment of the Castle Facility out of the Stella Sale Proceeds.  Compl. ¶¶ 90, 96.  The Stella Proceeds Deed included a provision under which OA irrevocably released and discharged its intercompany loans to the Stella Group, thereby extinguishing an alleged debt of at least $700 million.  Id. ¶ 94.  Considered together with the provision requiring immediate and direct

- 34 -

repayment of the Castle Facility from the Stella Sale Proceeds, the defendants—acting through FCCA2 and FIGA—induced Anderson and White to breach their fiduciary duties to OA by discharging the Stella Group's substantial intercompany debt to OA for nominal or no consideration.  These actions are a far more substantial inducement than the modest amount of pressure flowing from a mere demand for repayment of a legitimate debt.

Defendants' argument that the Liquidators failed to plead the inducement or participation element with sufficient particularity also fails.  As previously discussed, the Liquidators have pled the alleged misstatements in the Stella Proceeds Deed, and the defendants' knowledge and participation or inducement thereof, with sufficient particularity to satisfy the requirements of Rule 9(b), Fed. R. Civ. P.  Further, the complaint includes, both in itself and by reference to the complaint in the Australian Action, extensively detailed allegations setting forth the nature of the fiduciary duties of Anderson and White, and the actions that constituted a breach thereof.  Compl. ¶¶ 116-29.  Accordingly, defendants' motion to dismiss Count V of the complaint will be denied.

### 4.  Conversion Claims

The complaint includes three counts of conversion-related claims: conversion against Drawbridge, aiding and abetting FCCA2's conversion, against all defendants; and aiding and abetting Drawbridge's conversion, against Fortress and the Director Defendants.  "To establish a cause of action to recover damages for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights."  Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner, 938 N.Y.S.2d 138-

39 (2d Dep't 2012) (citations omitted).  To bring a claim for aiding and abetting conversion under New York law, a plaintiff must prove (1) the existence of a violation committed by a primary party; (2) actual knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the violation.  See Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003) (citing cases).

Defendants argue that the Liquidators' conversion claims fail because the proceeds of the Stella Sale were never in OA's actual or legal possession: the proceeds were transferred directly from CVC, the purchaser of the Stella Group, to the Australian Fortress Entities.  See Castaldi v. 39 Winfield Associates, 820 N.Y.S.2d 279, 279 (2d Dep't 2006) ("Although the plaintiff alleged a contractual right to payment . . . it never had ownership, possession, or control of the proceeds realized from the sale of the renovated premises.").  Defendants further note that according to the complaint, as a condition precedent to the closing of the sale of the Stella Group, OA discharged and released all its intercompany loan claims against Stella Group entities and therefore had no right to any of the Stella Sale Proceeds once the sale closed.

The Liquidators' conversion claim is premised on OA's alleged claim to the Stella Sale Proceeds.  They contend that because OA was the only material intercompany creditor of the Stella Group, OA had a superior claim to the Stella Sale Proceeds compared with the Australian Fortress Entities.  As alleged, this claim was future interest, because the Liquidators do not contend that they were entitled to immediate possession of the Stella Sale Proceeds following the sale of the Stella Group.  The Liquidators argue that conversion under New York law may encompass claims dealing with a right of future possession.  However, it is unclear whether New York allows conversion claims based on a right to future possession.  See Solow v.

Delit, 90-cv-2273 (LJF), 1993 WL 322838, at *6 (S.D.N.Y. Aug. 16, 1993) ("[I]t is not entirely

clear that New York has adopted Section 243 of the Second Restatement of Torts, which

provides that '[o]ne who is subject to liability for conversion to a person in possession of a

chattel, or to one entitled to its immediate possession, is also subject to liability to a person

entitled to the future possession of the chattel . . . .' ").

       The Liquidators rely primarily on Weizmann Inst. of Sci. v. Neschis, 229 F. Supp.

2d 234, 253 (S.D.N.Y. 2002), where the court held that plaintiffs had adequately pled a

conversion claim premised upon their future interest in funds pursuant to the by-laws of a trust.

The Weizmann court in turn relied on Goebel v. Clark, 275 N.Y.S. 43, 46 (4th Dep't 1934);

there, the Appellate Division held that an injury to plaintiff's reversionary interest in certain

personal property was "sufficient . . . to establish a cause of action, though not strictly in

conversion, against the defendant." Id.; see also New York Pattern Jury Instructions—Civil, PJI

3:10, cmt. (cum. supp. 2014) (citing Goebel at 46). "[T]o the extent that New York courts have

recognized that a person with a future interest in property is entitled to sue for conversion of that

property, it appears that the claimed future interest must be concrete and readily identifiable."

Solow, 1993 WL 322838, at *6 (citing Goebel at 46).

       Where money, as opposed to other personal property, is the subject of a

conversion claim, additional requirements apply under New York law. "An action for

conversion of money may be made out where there is a specific, identifiable fund and an

obligation to return or otherwise treat in a particular manner the specific fund in question." Thys

v. Fortis Sec. LLC, 903 N.Y.S.2d 368, 369 (1st Dep't 2010) (internal quotation and citation

omitted). Further, where money is the subject of a conversion claim, a plaintiff must have either

possessed the money or had a right to immediate possession of the money. See, e.g., Ehrlich v.

Howe, 848 F. Supp. 482, 492 (S.D.N.Y. 1994) (to establish a claim for conversion of money based on a purported future interest, a plaintiff must allege "that the money converted was in specific tangible funds of which the plaintiff was the legal owner and entitled to immediate possession") (citing Stack Elec. Inc. v. DiNardi Const. Corp., 555 N.Y.S.2d 346 (1st Dep't 1990)).  An action for conversion is not a vehicle for the enforcement of a mere obligation to pay money, without more.  See, e.g., Kirschner v. Bennett, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009); Ehrlich, at 492 (collecting cases); see also Daub v. Future Tech Enter., Inc., 885 N.Y.S.2d 115, 118 (2d Dep't 2009) ("[T]he mere right to payment cannot be the basis for a cause of action alleging conversion since the essence of a conversion cause of action is the unauthorized dominion over the thing in question."); Matzan v. Eastman Kodak Co., 521 N.Y.S.2d 917, 918 (4th Dep't 1987) ("A breach of contract does not give rise to a tort action in the absence of additional allegations of wrongdoing.") (citations omitted).

        Even assuming that a conversion claim based on a future interest is cognizable under New York law, the Liquidators' conversion claim is deficient.  Though the complaint alleges that OA was the only significant intercompany creditor of the Stella Group, this status alone does not demonstrate OA's legal entitlement to the Stella Sale Proceeds such that a conversion claim would lie under any theory of possession.  First, the complaint does not allege that OA ever actually possessed the portion of the Stella Sale Proceeds that constituted the Fortress Payment, which funds were transferred directly from purchaser Global to the Australian Fortress Entities.[5]  Second, the complaint does not allege that OA had any right to immediate possession of the Stella Sale Proceeds.  Third, while it is alleged that the Stella Group owed

---

[5] Although the November 2008 and February 2009 Payments, in which OA transferred funds to OL which in turn transferred the money to FCCA2, were at one point in the possession of OA, the Liquidators do not argue or allege that these payments form a basis for a conversion claim.  Compl. ¶¶ 266-71.

substantial money to OA, the complaint does not set forth the terms of this borrowing arrangement with any specificity, other than to allege that the total indebtedness was "between $737 million and $1.34 billion . . . ."  Compl. ¶ 7.

Thus, even if New York law recognizes claims for conversion based on a future interest, OA's claim to the Stella Sale Proceeds as a general unsecured creditor with respect to loans of uncertain terms and maturities is not definite, specific, and concrete enough to support a claim.[6]  While, as discussed below, plaintiffs have stated a claim for tortious interference with contractual relations, interference with a contractual obligation, without more, is an insufficient basis for a conversion claim.

The foregoing analysis applies with equal force to the primary conversion claim against FCCA2 that is alleged in the Liquidators' two claims for aiding and abetting conversion claims.[7]  The absence of a primary conversion claim forecloses the Liquidators' two claims for aiding and abetting.  See Calcutti, 273 F. Supp. 2d at 493.  Accordingly, the Liquidators' claims based on conversion—Counts XI, XII, and XIII—are dismissed for failure to state a claim.

---

[6] The Liquidators also rely upon dicta in a decision of the New York Court of Appeals that is part of an extended review of the history of the tort of conversion.  Thyroff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283, 288 (N.Y. 2007) ("Trover gave way slowly to the tort of conversion, which was created to address 'some interferences with chattels for which the action of trover would not lie,' such as a claim dealing with a right of future possession." (quoting Restatement [Second] of Torts § 222A, Comment b)).  In Thyroff, the New York Court of Appeals answered in the affirmative the certified question of whether a claim for the conversion of electronic data was cognizable under New York law; the analysis of this issue in no way implicated the issue of whether a conversion claim could be based on a right to future possession.  Id. at 293.

[7] Count XII, which charges all defendants with aiding and abetting FCCA2's fraudulent transfer, includes funds in the October 2008 and February 2009 Payments as part of the allegedly converted property.  These funds were transferred from OA to OL, and OL in turn transferred them to FCCA2.  Since the transfers were effected, FCCA2 has held the funds in an escrow account.  OA voluntarily made these two transfers to OL ten and fourteen months, respectively, after the close of the Stella Sale and OA's release of all its intercompany creditor claims against entities in the Stella Group.  Like the Fortress Payment, the Liquidators have alleged only generalized statements regarding OA's status as an intercompany creditor of the Stella Group and have not alleged a right to possession of these proceeds such that a conversion action would lie.

5.  <u>Unjust Enrichment</u>

Against Drawbridge, the Liquidators bring a claim of unjust enrichment under New York law based on the transfer of the Fortress Payment to Drawbridge in New York. Compl. ¶ 240.  Defendants argue that the Liquidators' unjust enrichment claim must be dismissed because it is duplicative of the Liquidators' other claims.  See <u>Corsello v. Verizon N.Y., Inc.</u>, 18 N.Y.3d 777, 790 (2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.") (internal citations omitted); <u>Miller v. Wells Fargo Bank, N.A.</u>, 2014 WL 349723, at *10 (S.D.N.Y. Jan. 30, 2014) (citing <u>Corsello</u> and dismissing claim where "plaintiff's unjust enrichment claim simply rehashes his aiding and abetting [breach of fiduciary duty] claim . . . .").  Unjust enrichment is an equitable cause of action, which "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."  <u>Corsello</u>, 18 N.Y.3d at 790. However, a claim for unjust enrichment may be pleaded in the alternative to other claims.  See Fed. R. Civ. P. 8(a) ("[A] demand for the relief sought . . . may include relief in the alternative or different types of relief."); <u>Newman & Schwartz v. Asplundh Tree Expert Co., Inc.</u>, 102 F.3d 660, 663 (2d Cir. 1996) (reversing the dismissal of an unjust enrichment claim and holding that the claim was properly pleaded in the alternative to a contractual claim).

To plead a claim of unjust enrichment under New York law, a plaintiff must allege: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff."  <u>Golden Pac. Bancorp v. FDIC</u>, 273 F.3d 509, 519 (2d Cir. 2001).  The Liquidators have alleged that defendants wrongfully

diverted a substantial portion of the Stella Sale Proceeds for the repayment of loans, including

the Castle Facility, from defendants to the Octaviar Group, and that OA was entitled to these

proceeds for the repayment of its intercompany loans to the Stella Group.  On the instant motion,

the Liquidators' allegations adequately set forth a basis for the third element of inequitable

circumstances.  Accordingly, the Liquidators' allegations are sufficient to survive a dismissal for

failure to state a claim under Rule 12(b)(6).


      6.  <u>Tortious Interference with Contractual Relations</u>

      Against all defendants, the Liquidators bring a claim of tortious interference with

contractual relations.  In order to state a claim for tortious interference with contractual relations

under New York law, a plaintiff must show "(1) the existence of a valid contract between the

plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's

intentional procurement of the third-party's breach of the contract without justification; (4) actual

breach of the contract; and (5) damages resulting therefrom."  <u>Kirch v. Liberty Media Corp.</u>, 449

F.3d 388, 401-02 (2d Cir. 2006) (quoting <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d

413, 424, (1996)) (internal quotation marks omitted).

      Defendants contend that because their allegedly wrongful actions were

undertaken to ensure the repayment of the Castle Facility and other outstanding loans from the

Australian Fortress Entities to the Octaviar Group, the Liquidators' claim for tortious

interference with contractual relations must fail.  Defendants cite <u>Northern Shipping Funds I,</u>

<u>L.L.C. v. Icon Capital Corp.</u>, 12-cv-3584 (JCF), 2013 WL 1500333, at *5 (S.D.N.Y. Apr. 12,

2013), for the proposition that "[u]nder New York law, actions taken to protect an economic

interest are justified and cannot give rise to a tortious interference with a contract claim."  <u>Id.</u>

(citations omitted).  However, in this context the so-called "economic interest" defense is an affirmative defense that is not properly addressed on a motion to dismiss.  See Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc., 11-cv-5832 (AJN), 2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012) ("Several courts in the Second Circuit have refused to apply the economic interest defense at the pleading stage to dismiss complaints for tortious interference with contract, explaining that the facts of the pleadings were not sufficiently developed to show entitlement to the defense.").

Here, the Liquidators have alleged each of the required elements of a claim for tortious interference with contractual relations: according to the complaint, OA was a party to valid and enforceable contracts with intercompany debtors in the Stella Group; defendants had knowledge of this arrangement; by diverting a portion of the Stella Sale Proceeds and rendering OA insolvent, defendants caused companies within the Stella Group to actually breach repayment obligations under these contracts; and OA suffered damages in excess of $209 million.  (Compl. ¶¶ 285-290)  Defendants' attempt to recharacterize plaintiffs' allegations in terms of defendants' own interest in the repayment of the Castle Facility improperly asserts factual arguments in the context of a motion to dismiss.  Accordingly, defendants' motion to dismiss this claim is denied.

E.  Internatonal Comity

Defendants argue that, even if the complaint is not dismissed under Rule 12(b)(6), this action should be dismissed or stayed in favor of the Australian Action based on principles of international comity.  Defendants contend that plaintiffs' complaint is entirely dependent on legal and factual findings to be made in the Australian Action.

"International comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience.' " Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006) (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)). The principles of international comity vary in their application depending on whether a party seeks the recognition of a foreign judgment that has become final, or whether a party seeks "the recognition of a pending foreign proceeding that has yet to reach a final judgment." Id. The instant case falls within the latter category. In this context, the Second Circuit has stated:

> [g]enerally, concurrent jurisdiction in United States courts and the courts of a foreign sovereign does not result in conflict. Rather, parallel proceedings in the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other. The mere existence of parallel foreign proceedings does not negate the district courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).

Id. (other internal quotations and citations omitted). The Second Circuit further instructed that "[t]he task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification for the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of jurisdiction." Id. at 93 (citing Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 25-26 (1983); Colorado River, 424 U.S. at 813) (emphasis in original).

In assessing whether "exceptional circumstances" are present, a district court must identify "considerations which are not generally present as a result of parallel litigation," and carefully balance the "totality of the circumstances." Id. at 93-94. The relevant circumstances are guided by the principles of international comity, and include "the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial

efficiency." Id. at 94.  These principles, in turn, generally require a court to consider factors such as "the similarity of parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction." Id.  It is only where such considerations reveal circumstances which are sufficiently exceptional and outweigh the "virtually unflagging obligation" of the Court to exercise its jurisdiction that abstention is appropriate. Id.

In Royal & Sun Alliance, the Second Circuit also addressed the propriety of staying proceedings in the United States in deference to a foreign pending action.  The Second Circuit recognized the Supreme Court's caution that " 'a stay is as much a refusal to exercise jurisdiction as a dismissal' because the decision to grant a stay 'necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.' " Id. at 96 (quoting Moses H. Cone, 460 U.S. at 28).  Nevertheless, the Second Circuit stated that in certain circumstances a "measured temporary stay need not result in a complete forfeiture of jurisdiction," and may be appropriate to give a district court "a window to determine whether the foreign action will in fact offer an efficient vehicle for fairly resolving all the rights of the parties . . . ." Id.  Such a stay should usually be considered before granting a motion to dismiss in deference to a pending foreign action, and a decision on a request for a stay is made by reference to the same standards as a motion to dismiss on such grounds. Id.

On the present record, defendants have not carried their burden of demonstrating the exceptional circumstances necessary for this Court to decline to exercise its jurisdiction based on the pendency of a foreign proceeding.  It is true, as plaintiffs have conceded, that this action "arises out of the same underlying facts and circumstances as the [Australian Action]."

Compl. ¶ 11. However, this Court previously held in the FNC Decision that defendants are judicially estopped from consenting to the jurisdiction of the Australian courts, and the Liquidators adequately demonstrated that, absent such consent, the Australian courts would be unable to exercise personal jurisdiction over the U.S. Defendants. Dkt. No. 56 at 18-19. Based on this determination, it appears that Australia is not an adequate alternative forum for the trial of this action. See Royal & Sun at 94. A dismissal or stay of the instant action would thus potentially leave the Liquidators without any forum in which to pursue their claims against the U.S. Defendants. Accordingly, at the present juncture the motion to dismiss or stay this action on the ground of international comity is denied. Further developments in this case or the Australian Action may alter the foregoing analysis, in which event the Court may revisit this determination.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' claims pursuant to rule 12(b)(6) and on the ground of international comity (Dkt. No. 31) is GRANTED as to Counts II, III, XI, XII, and XIII and DENIED as to all other counts.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 5, 2014